[Civ. No. 38. Fourth Appellate District.—April 7, 1930.]

ROWENA COOVER, Respondent, v. PAINLESS PARKER, DENTIST (a Corporation), Appellant.

A. S. Humphreys and Sweet & Plank for Appellants.

Sample & Harden and Harden & Green for Respondent.

BARNARD, J.—This was an action for damages for personal injuries sustained by the plaintiff, as a result of overexposure in the taking of dental X-ray photographs of the plaintiff, by the defendant. From a judgment for $10,250, based upon the verdict of a jury, the defendant has appealed. The sole ground of the appeal is that the amount of the verdict, in view of the injuries sustained, is grossly excessive, and suggests passion or prejudice on the part of the jury. The plaintiff testified that as a result of the burns in question she suffered torture, the terrible suffering lasting for three months, during which time she was unable to sleep "without they gave me something"; that she spent most of the first three months in bed; and that at the time of the trial, something over a year after the burns, she was still extremely nervous. In reply to the question whether she still had very much pain, she replied: "Well, I am suffering—I am just so awfully nervous, there is a tingling sensation in my face." She also gave the following testimony:

"Q. Have you noticed any changed condition in your eyes? A. A decided change in my eyes.

"Q. What kind of a change? A. It was about—it must have been three weeks after the burn, my eyelids began to draw, the under lids began to draw away from the eyes, and my eyelids turned wrong side outward, I was blinded, and that was when they called Dr. Thomas in, and he put me in a dark room, put goggles on and a shade over my eyes, and kept medicine in my eyes constantly, trying to keep my eyelids from turning wrong side out and leaving the eyeballs, and I have never been able to see well since."

One physician testified he examined the plaintiff shortly after the burns were inflicted and again a few days before the trial. He describes her condition the first time he saw her as follows:

"Her face was red, a dark purple red, around both the upper and the lower jaw, it was swollen, and her right eye was swollen and the skin around it was swollen, also the skin on her neck on both sides was thickened and swollen and a dusky red."

In respect to her condition just before the trial, he testified as follows:

"Q. What did you discover her condition to be at that time? A. Well, her original X-ray reaction had disappeared, and in place of it there are the usual sequeli that follow. She had an atrophy of the skin, that is shrinking and toughening and shriveling of the skin over her right cheek, she had tanning on her neck on both sides, tanning of her skin over her lower jaw and the little blood vessels springing up all over the end of her nose in the atrophied area in her right cheek.

"Q. Would you say this condition was the result of the X-ray burn? A. As a result of over X-ray exposure, yes.

"Q. How long would you say that condition would continue with her? A. These are probably permanent things. The tanning may fade somewhat, the atrophy will stay, the blood vessels—the new blood vessels may increase somewhat in size, the blotching of her right cheek may increase somewhat in the next few months."

When asked if she would continue to suffer pain he replied:

"Well, she will be hypersensitive to sunburn, she will be hypersensitive to the steam in her kitchen, and things of that sort, her skin will burn up and tingle and make her uncomfortable, I do not say it will cause her pain."

In regard to her nervous condition, he testified that the plaintiff had passed through the shock of from two to three months of severe pain and suffering, and to that extent she had diminished her nervous reserve, and that in his opinion this X-ray burn could of itself cause her nervous condition, although at another time he testified that her nervous condition was in part contributed to by another factor, not connected with the burns in question.

Another physician testified that he treated the plaintiff during a period of a little more than three months, following the taking of the last X-ray picture. In reference to her condition at first he testified as follows:

"The face was badly swollen, red, livid color, almost cyanotic—it was cyanotic.

"The Court: What do you mean by that?

"A. Black,—a very dark red. What I mean by cyanosis, Judge, is more of a congestion of the skin, and she was suffering acutely.

"Q. And how long did you continue to treat her? A. Well, I saw Mrs. Coover—the last time I saw Mrs. Coover was the last of July, the 30th of July. . . .

"Q. What was her condition during that interval? A. Well, for days she suffered very, very acutely, as they do from X-ray burns. There is no dermatological condition in which one suffers more than they do from an X-ray dermatitis or an X-ray burn, and there is very little which you can do to alleviate that. About the second or third day after I first saw Mrs. Coover, her face blistered, some blistering, these blisters ruptured, leaving a necrotic base.

"Q. What do you mean by that, Doctor? Necrotic base, did you say? A. Yes, the tissues were dead, the blood vessels were cut off, the superficial blood vessels were cut off."

In reference to her condition on the day of the trial, he testified as follows:

"Q. And what condition is it in today, Doctor? A. Over the areas that ulcerated, that is, they broke down and were necrotic, shows a senile condition of the skin. . . .

"A. It is on the right side, it is in here, extending up to the border of the hair, and there is some little loss of hair in that area, then down, up to the corner of the eye the skin is soft and of a deadwhite color. When you get a senile condition of the skin following an X-ray burn, the hair follicles and sebaceous follicles are destroyed. The light has destroyed these hair follicles—you have a skin that is not functioning and our medical literature is full of cases of cancer—carcinoma that have developed upon a senile skin following an X-ray burn.

"Q. You give your professional opinion to the effect that Mrs. Coover at this time might be in danger of a cancerous growth? A. I do not say that she has a cancerous growth, she has not, but a cancer may develop on this area—it is common."

He also testified:

"Q. Her face is slightly scarred at this time? A. Yes.

"Q. Will that be permanent? A. That will be permanent, and there may possibly be some further changes in the skin. On this senile skin not infrequently develops new growths, little neoplasm, warty growths, and from these warty growths, the carcinoma develops; sometimes that is a year, sometimes it is two years—sometimes it is three or four years before they develop.

He also testified that over the area affected the plaintiff has a skin that is predisposed to cancer, that she had some disturbance with the sensory nerves of her face, and then:

"Q. In the event the sensory nerves have been destroyed, in this portion of the face that is burned or impaired, what would be the natural consequence of such a condition, in other words, what effect would that have on Mrs. Coover? A. The most important sequela from a dermatological standpoint is the possibility of carcinoma—of a cancer."

In reply to questions by the court he testified as follows:

"Q. I had more particular reference to the possibility of developing cancer. A. You say does it always? Not always.

"Q. It may happen that she can go on through life without that occurring, I suppose? A. It is possible, but we do find many times, carcinoma developing upon the scars of X-ray burns, in all of our literature they speak of that as very, very likely sequela, it is the thing to be guarded against and to be watched."

The plaintiff's husband testified as follows:

"Q. What have you noticed as to her nervous temperament or disposition since the X-ray burn? A. So much so that at night when she would retire possibly around seven o'clock for the last fourteen or fifteen months, it would be twelve, probably, to one or two o'clock in the morning before she would doze off at all, then at times she would wake up from the rest of the night with the movement of her arms, or twitching of her limbs to such extent it would wake her up again.

"Q. Does that condition continue down to this time? A. Even until last night."

While there was evidence that the plaintiff's nervousness could have been caused by the X-ray burns and other evidence that the same may have been otherwise contributed to

in part, any conflict arising therefrom was for the jury, and if that was considered at all in arriving at the verdict, it could not be disturbed on appeal.

Appellant argues that the evidence as to the possibility of cancer is wholly conjectural and uncertain and that that element could not have rightfully been considered by the jury. The court instructed the jury that they were to consider as elements of damage only such physical injury as they may find the plaintiff is certain to suffer in the near future. If we assume that respondent's skin condition was considered by the jury it by no means follows that this was improper. While the actual condition of cancer may have been conjectural and uncertain, the record contains positive evidence that a condition actually exists which makes this dread disease much more likely. We think this predisposition in itself is some damage, and when caused by the wrongful act of another it is an interference with the normal and natural conditions and rights of the other, which must be held to be a real and not a fanciful element of damage. The necessity of constantly watching and guarding against cancer, as testified to by the physician, is an obligation and a burden that the defendant had no right to inflict upon the plaintiff.

The appellant further argues that the evidence shows the disfiguration of the plaintiff was slight. While it is true that one witness replied in the affirmative to the question "Her face is slightly scarred at this time?" the other evidence above referred to is to the contrary and we cannot hold in the face of such other evidence that the scar and disfiguration were not of considerable proportions. Not only was the conflict in the evidence one for the jury to decide, but the best evidence was before them. While the plaintiff is married and forty-five years of age, it does not follow that such disfiguration is not a material element in the damage she suffered. While advancing years, in spite of some other compensation, bring a change in the fact, and perhaps in the relative importance, of the appearance of the natural features, even a person of middle age has a substantial right not to have this change hastened or aggravated by the wrongful act of another, and especially so when the result amounts to an actual disfiguration.

In the case of *Kelley* v. *Hodge Transp. System,* 197 Cal. 598 [242 Pac. 76, 81], the rule is set forth as follows:

"Unless we are able to say that the award of damages made by the jury and sustained by the trial court was so grossly disproportionate to any compensation reasonably warranted by the facts as presented to us on appeal as to shock the sense of justice and raise at once a presumption that it was the result of passion, prejudice, or corruption, rather than an honest and sober judgment, this court may not exercise the power of revision. (8 Cal. Jur. 834; *Holmes* v. *California Crushed Fruit Co.*, 69 Cal. App. 779 [232 Pac. 178]; *Zibbell* v. *Southern Pac. Co.*, 160 Cal. 237 [116 Pac. 513].)" From the record before us we are unable to say that the amount of the verdict is such as to shock the sense of justice, or to raise any presumption that the same was the result of passion or prejudice on the part of the jury.

The judgment appealed from is affirmed.

Marks, Acting P. J., and Beaumont, J., *pro tem.*, concurred.