ORTIZ ET AL. *v.* FIBREBOARD CORP. ET AL.

No. 97–1704.   Argued December 8, 1998—Decided June 23, 1999

816

818

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, THOMAS, and GINSBURG, JJ., joined. REHNQUIST, C. J., filed a concurring opinion, in which SCALIA and KENNEDY, JJ., joined, *post*, p. 865. BREYER, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 865.

*Laurence H. Tribe* argued the cause for petitioners. With him on the briefs were *Brian Koukoutchos, Jonathan S. Massey, Frederick M. Baron, Brent M. Rosenthal,* and *Steve Baughman.*

*Elihu Inselbuch* argued the cause for respondents. With him on the brief for respondents Ahearn et al. were *Peter Van N. Lockwood, Joseph B. Cox, Jr., Joseph F. Rice, Steven Kazan,* and *Harry F. Wartnick. Herbert M. Wachtell, Paul J. Bschorr, Richard B. Sypher, Kelly C. Wooster, Stephen M. Snyder, William R. Irwin, Rodney L. Eshelman, Donald T. Ramsey, Stuart Philip Ross, Sean M. Hanifan, Merril J. Hirsh,* and *Michael E. Jones* filed a brief for respondents Continental Casualty Co. et al.*

---

*Briefs of *amici curiae* urging reversal were filed for the Association of Trial Lawyers of America by *Jeffrey Robert White* and *Mark S. Mandell;* for Trial Lawyers for Public Justice, P. C., by *Arthur H. Bryant* and *Anne Bloom;* and for Legal Ethics, Civil Procedure, and Constitutional Law Scholars by *Roger C. Cramton, Kenneth J. Chesebro,* and *Barbara J. Olshansky.*

Briefs of *amici curiae* urging affirmance were filed for Asbestos Victims of America by *Daniel U. Smith;* for Exxon Corporation by *Charles W. Bender, John F. Daum,* and *Charles C. Lifland;* and for the National Association of Securities and Commercial Law Attorneys by *Kevin P. Roddy* and *Arthur R. Miller.*

JUSTICE SOUTER delivered the opinion of the Court.

This case turns on the conditions for certifying a mandatory settlement class on a limited fund theory under Federal Rule of Civil Procedure 23(b)(1)(B). We hold that applicants for contested certification on this rationale must show that the fund is limited by more than the agreement of the parties, and has been allocated to claimants belonging within the class by a process addressing any conflicting interests of class members.

I

Like *Amchem Products, Inc.* v. *Windsor*, 521 U.S. 591 (1997), this case is a class action prompted by the elephantine mass of asbestos cases, and our discussion in *Amchem* will suffice to show how this litigation defies customary judicial administration and calls for national legislation.[1] In 1967, one of the first actions for personal asbestos injury was filed in the United States District Court for the Eastern District

---

[1] " '[This] is a tale of danger known in the 1930s, exposure inflicted upon millions of Americans in the 1940s and 1950s, injuries that began to take their toll in the 1960s, and a flood of lawsuits beginning in the 1970s. On the basis of past and current filing data, and because of a latency period that may last as long as 40 years for some asbestos related diseases, a continuing stream of claims can be expected. The final toll of asbestos related injuries is unknown. Predictions have been made of 200,000 asbestos disease deaths before the year 2000 and as many as 265,000 by the year 2015.

" 'The most objectionable aspects of asbestos litigation can be briefly summarized: dockets in both federal and state courts continue to grow; long delays are routine; trials are too long; the same issues are litigated over and over; transaction costs exceed the victims' recovery by nearly two to one; exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.' " *Amchem Products, Inc.* v. *Windsor*, 521 U.S., at 598 (quoting Report of The Judicial Conference Ad Hoc Committee on Asbestos Litigation 2-3 (Mar. 1991) (hereinafter Report)). We noted in *Amchem* that the Judicial Conference Ad Hoc Committee on Asbestos Litigation in 1991 had called for "federal legislation creating a national asbestos dispute-resolution scheme." 521 U.S., at 528 (citing Report 3, 27-35). To date Congress has not responded.

of Texas against a group of asbestos manufacturers. App. to Pet. for Cert. 252a. In the 1970's and 1980's, plaintiffs' lawyers throughout the country, particularly in East Texas, honed the litigation of asbestos claims to the point of almost mechanical regularity, improving the forensic identification of diseases caused by asbestos, refining theories of liability, and often settling large inventories of cases. See D. Hensler, W. Felstiner, M. Selvin, & P. Ebener, Asbestos in the Courts: The Challenge of Mass Toxic Torts vii (1985); McGovern, Resolving Mature Mass Tort Litigation, 69 B. U. L. Rev. 659, 660–661 (1989); see also App. to Pet. for Cert. 253a.

Respondent Fibreboard Corporation was a defendant in the 1967 action. Although it was primarily a timber company, from the 1920's through 1971 the company manufactured a variety of products containing asbestos, mainly for high-temperature industrial applications. As the tide of asbestos litigation rose, Fibreboard found itself litigating on two fronts. On one, plaintiffs were filing a stream of personal injury claims against it, swelling throughout the 1980's and 1990's to thousands of new claims for compensatory damages each year. *Id.,* at 265a; App. 1040a. On the second front, Fibreboard was battling for funds to pay its tort claimants. From May 1957 through March 1959, respondent Continental Casualty Company had provided Fibreboard with a comprehensive general liability policy with limits of $1 million per occurrence, $500,000 per claim, and no aggregate limit. Fibreboard also claimed that respondent Pacific Indemnity Company had insured it from 1956 to 1957 under a similar policy. App. to Pet. for Cert. 267a–268a. Beginning in 1979, Fibreboard was locked in coverage litigation with Continental and Pacific in a California state trial court, which in 1990 held Continental and Pacific responsible for indemnification as to any claim by a claimant exposed to Fibreboard asbestos products prior to their policies' respective

expiration dates. *Id.*, at 268a–269a. The decree also required the insurers to pay the full cost of defense for each claim covered. *Ibid.* The insurance companies appealed.

With asbestos case filings continuing unabated, and its secure insurance assets almost depleted, Fibreboard in 1988 began a practice of "structured settlement," paying plaintiffs 40 percent of the settlement figure up front with the balance contingent upon a successful resolution of the coverage dispute.[2] By 1991, however, the pace of filings forced Fibreboard to start settling cases entirely with the assignments of its rights against Continental, with no initial payment. To reflect the risk that Continental might prevail in the coverage dispute, these assignment agreements generally carried a figure about twice the nominal amount of earlier settlements. Continental challenged Fibreboard's right to make unilateral assignments, but in 1992 a California state court ruled for Fibreboard in that dispute.[3]

Meanwhile, in the aftermath of a 1990 Federal Judicial Center conference on the asbestos litigation crisis, Fibreboard approached a group of leading asbestos plaintiffs' lawyers, offering to discuss a "global settlement" of its asbestos

---

[2] Because Fibreboard's insurance policy with Continental expired in 1959, before the global settlement the settlement value of claims by victims exposed to Fibreboard's asbestos prior to 1959 was much higher than for victims exposed after 1959, where the only right of recovery was against Fibreboard itself. See *In re Asbestos Litigation,* 90 F. 3d 963, 1012–1013 (CA5 1996) (Smith, J., dissenting).

[3] *Id.*, at 969, and n. 1 (citing *Andrus* v. *Fibreboard,* No. 614747–3 (Sup. Ct., Alameda Cty., June 1, 1992)). Continental appealed, and, after the Global Settlement Agreement was reached in this case, but before the fairness hearing, see *infra,* at 827, a California appellate court reversed. See 90 F. 3d, at 969, and n. 1 (citing *Fibreboard Corp.* v. *Continental Casualty Co.,* No. A059716 (Cal. App., Oct. 19, 1994)). Continental and Fibreboard had each brought actions seeking to establish (or challenge) the validity of Fibreboard's assignment-settlement program, but only *Andrus* produced a definitive ruling as opposed to a settlement. See App. to Pet. for Cert. 288a–290a.

personal-injury liability. Early negotiations bore relatively little fruit, save for the December 1992 settlement by assignment of a significant inventory of pending claims. This settlement brought Fibreboard's deferred settlement obligations to more than $1.2 billion, all contingent upon victory over Continental on the scope of coverage and the validity of the settlement assignments.

In February 1993, after Continental had lost on both issues at the trial level, and thus faced the possibility of practically unbounded liability, it too joined the global settlement negotiations. Because Continental conditioned its part in any settlement on a guarantee of "total peace," ensuring no unknown future liabilities, talks focused on the feasibility of a mandatory class action, one binding all potential plaintiffs and giving none of them any choice to opt out of the certified class. Negotiations continued throughout the spring and summer of 1993, but the difficulty of settling both actually pending and potential future claims simultaneously led to an agreement in early August to segregate and settle an inventory of some 45,000 pending claims, being substantially all those filed by one of the plaintiffs' firms negotiating the global settlement. The settlement amounts per claim were higher than average, with one-half due on closing and the remainder contingent upon either a global settlement or Fibreboard's success in the coverage litigation. This agreement provided the model for settling inventory claims of other firms.

With the insurance companies' appeal of the consolidated coverage case set to be heard on August 27, the negotiating parties faced a motivating deadline, and about midnight before the argument, in a coffee shop in Tyler, Texas, the negotiators finally agreed upon $1.535 billion as the key term of a "Global Settlement Agreement." $1.525 billion of this sum would come from Continental and Pacific, in the proportion established by the California trial court in the coverage case,

while Fibreboard would contribute $10 million, all but $500,000 of it from other insurance proceeds, App. 84a. The negotiators also agreed to identify unsettled present claims against Fibreboard and set aside an as-then unspecified fund to resolve them, anticipating that the bulk of any excess left in that fund would be transferred to class claimants. *Ahearn* v. *Fibreboard Corp.*, 162 F. R. D. 505, 517 (ED Tex. 1995). The next day, as a hedge against the possibility that the Global Settlement Agreement might fail, plaintiffs' counsel insisted as a condition of that agreement that Fibreboard and its two insurers settle the coverage dispute by what came to be known as the "Trilateral Settlement Agreement." The two insurers agreed to provide Fibreboard with funds eventually set at $2 billion to defend against asbestos claimants and pay the winners, should the Global Settlement Agreement fail to win approval. *Id.*, at 517, 521; see also App. to Pet. for Cert. 492a.[4]

On September 9, 1993, as agreed, a group of named plaintiffs filed an action in the United States District Court for the Eastern District of Texas, seeking certification for settlement purposes of a mandatory class comprising three groups: all persons with personal injury claims against Fibreboard for asbestos exposure who had not yet brought suit or settled their claims before the previous August 27; those who had dismissed such a claim but retained the right to bring a future action against Fibreboard; and "past, present and future spouses, parents, children, and other relatives" of class mem-

---

[4] Two related settlement agreements accompanied the Global and Trilateral Settlement Agreements. The first, negotiated with representatives of Fibreboard's major codefendants, preserved credit rights for codefendant third parties, *In re Asbestos Litigation*, 90 F. 3d 963, 973 (CA5 1996); the second provided that final approval of the Global Settlement Agreement would not constitute a "settlement" under the Longshore and Harbor Workers' Compensation Act, 33 U. S. C. § 933(g), 162 F. R. D., at 521–522. Neither of these agreements is before the Court.

bers exposed to Fibreboard asbestos.[5] The class did not include claimants with actions presently pending against Fibreboard or claimants "who filed and, for cash payment or some other negotiated value, dismissed claims against Fibreboard, and whose only retained right is to sue Fibreboard upon development of an asbestos-related malignancy." *Id.,*

---

[5]The final judgment regarding class certification in the District Court defined the class as follows:

"(a) All persons (or their legal representatives) who prior to August 27, 1993 were exposed, directly or indirectly (including but not limited to exposure through the exposure of a spouse, household member or any other person), to asbestos or to asbestos-containing products for which Fibreboard may bear legal liability and who have not, before August 27, 1993, (i) filed a lawsuit for any asbestos related personal injury, or damage, or death arising from such exposure in any court against Fibreboard or persons or entities for whose actions or omissions Fibreboard bears legal liability; or (ii) settled a claim for any asbestos-related personal injury, or damage, or death arising from such exposure with Fibreboard or with persons or entities for whose actions or omissions Fibreboard bears legal liability;

"(b) All persons (or their legal representatives) exposed to asbestos or to asbestos-containing products, directly or indirectly (including but not limited to exposure through the exposure of a spouse, household member or any other person), who dismissed an action prior to August 27, 1993 without prejudice against Fibreboard, and who retain the right to sue Fibreboard upon development of a nonmalignant disease process or a malignancy; provided, however, that the Settlement Class does not include persons who filed and, for cash payment or some other negotiated value, dismissed claims against Fibreboard, and whose only retained right is to sue Fibreboard upon development of an asbestos-related malignancy; and

"(c) All past, present and future spouses, parents, children and other relatives (or their legal representatives) of the class members described in paragraphs (a) and (b) above, except for any such person who has, before August 27, 1993, (i) filed a lawsuit for the asbestos-related personal injury, or damage, or death of a class member described in paragraph (a) or (b) above in any court against Fibreboard (or against entities for whose actions or omissions Fibreboard bears legal liability), or (ii) settled a claim for the asbestos-related personal injury, or damage, or death of a class member described in (a) or (b) above with Fibreboard (or with entities for whose actions or omissions Fibreboard bears legal liability)." App. to Pet. for Cert. 534a–535a.

at 534a–535a.  The complaint pleaded personal injury claims against Fibreboard, and, as justification for class certification, relied on the shared necessity of ensuring insurance funds sufficient for compensation.  *Id.*, at 552a–569a.  After Continental and Pacific had obtained leave to intervene as party-defendants, the District Court provisionally granted class certification, enjoined commencement of further separate litigation against Fibreboard by class members, and appointed a guardian ad litem to review the fairness of the settlement to the class members.  See *In re Asbestos Litigation*, 90 F. 3d 963, 972 (CA5 1996).

As finally negotiated, the Global Settlement Agreement provided that in exchange for full releases from class members, Fibreboard, Continental, and Pacific would establish a trust to process and pay class members' asbestos personal injury and death claims.  Claimants seeking compensation would be required to try to settle with the trust.  If initial settlement attempts failed, claimants would have to proceed to mediation, arbitration, and a mandatory settlement conference.  Only after exhausting that process could claimants go to court against the trust, subject to a limit of $500,000 per claim, with punitive damages and prejudgment interest barred.  Claims resolved without litigation would be discharged over three years, while judgments would be paid out over a 5- to 10-year period.  The Global Settlement Agreement also contained spendthrift provisions to conserve the trust, and provided for paying more serious claims first in the event of a shortfall in any given year.  *Id.*, at 973.

After an extensive campaign to give notice of the pending settlement to potential class members, the District Court allowed groups of objectors, including petitioners here, to intervene.  After an 8-day fairness hearing, the District Court certified the class and approved the settlement as "fair, adequate, and reasonable" under Rule 23(e).  *Ahearn*, 162 F. R. D., at 527.  Satisfied that the requirements of Rule

23(a) were met, *id.*, at 523–526,[6] the District Court certified the class under Rule 23(b)(1)(B),[7] citing the risk that Fibreboard might lose or fare poorly on appeal of the coverage case or lose the assignment-settlement dispute, leaving it without funds to pay all claims. *Id.*, at 526. The "allowance of individual adjudications by class members," the District Court concluded, "would have destroyed the opportunity to compromise the insurance coverage dispute by creating the settlement fund, and would have exposed the class members to the very risks that the settlement addresses." *Id.*, at 527. In response to intervenors' objections that the absence of a "limited fund" precluded certification under Rule 23(b)(1)(B), the District Court ruled that although the subdivision is not so restricted, if it were, this case would qualify. It found both the "disputed insurance asset liquidated by the $1.535 billion Global Settlement," and, alternatively, "the sum of the value of Fibreboard plus the value of its insurance coverage," as measured by the insurance funds' settlement value, to be relevant "limited funds." App. to Pet. for Cert. 491a–492a.

On appeal, the Fifth Circuit affirmed both as to class certification and adequacy of settlement. *In re Asbestos Litiga-*

---

[6] "Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical . . . of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Amchem Products, Inc.* v. *Windsor,* 521 U. S. 591, 613 (1997).

[7] Rule 23(b)(1)(B) provides that "[a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: (1) the prosecution of separate actions by or against individual members of the class would create a risk of . . . (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests."

*tion, supra.*[8]   Agreeing with the District Court's application of Rule 23(a), the Court of Appeals found that there was commonality in class members' shared interest in securing and equitably distributing maximum possible settlement funds, and that the representative plaintiffs were sufficiently typical both in sharing that interest and in basing their claims on the same legal and remedial theories that absent class members might raise. *Id.,* at 975–976. The Fifth Circuit also thought that there were no conflicts of interest sufficiently serious to undermine the adequacy of class counsel's representation. *Id.,* at 976–982.[9]   As to Rule 23(b)(1)(B), the court approved the class certification on a "limited fund" rationale based on the threat to "the ability of other members of the class to receive full payment for their injuries from Fibreboard's limited assets." *Id.,* at 982.[10]   The Court of Appeals cited expert testimony that Fibreboard faced enormous potential liabilities and defense costs that would likely equal or exceed the amount of damages paid out, and concluded that even combining Fibreboard's value of some $235 million with the $2 billion provided in the Trilateral Settlement Agreement, the company would be unable to pay all valid claims against it within five to nine years. *Ibid.* Judge Smith dissented, arguing among other things that the

[8] Continental and Pacific also filed a class action against a defendant class essentially identical to the plaintiff class in the Global Settlement Agreement as well as a class of third parties with asbestos-related claims against Fibreboard, seeking a declaration that the Trilateral Settlement Agreement was fair and reasonable. The District Court certified the class and approved the Trilateral Settlement Agreement, which the Fifth Circuit consolidated with the review of the case below and affirmed. See *In re Asbestos Litigation,* 90 F. 3d, at 974, 991–993. That decision is now final and is not before this Court.

[9] As the objectors did not challenge the adequacy of representation of class representatives, the Fifth Circuit did not consider the issue. *Id.,* at 976, n. 10. Likewise, no party raised concerns with Rule 23(a)'s numerosity requirement.

[10] Abandoning the District Court's alternative rationale, the Court of Appeals rested entirely on a limited fund theory.

majority had skimped on serious due process concerns, had glossed over problems of commonality, typicality, and adequacy of representation, and had ignored a number of justiciability issues. See generally *id.*, at 993–1026.[11]

Shortly thereafter, this Court decided *Amchem* and proceeded to vacate the Fifth Circuit's judgment and remand for further consideration in light of that decision. 521 U. S. 1114 (1997). On remand, the Fifth Circuit again affirmed, in a brief *per curiam* opinion, distinguishing *Amchem* on the grounds that the instant action proceeded under Rule 23(b)(1)(B) rather than (b)(3), and did not allocate awards according to the nature of the claimant's injury. *In re Asbestos Litigation,* 134 F. 3d 668, 669–670 (1998). Again citing the findings on certification under Rule 23(b)(1)(B), the Fifth Circuit affirmed as "incontestable" the District Court's conclusion that the terms of the subdivision had been met. *Id.,* at 670. The Court of Appeals acknowledged *Amchem*'s admonition that settlement class actions may not proceed unless the requirements of Rule 23(a) are met, but noted that the District Court had made extensive findings supporting its Rule 23(a) determinations. *Ibid.* Judge Smith again dissented, reiterating his previous concerns, and argued specifically that the District Court erred in certifying the class under Rule 23(b)(1)(B) on a "limited fund" theory because the only limited fund in the case was a creature of the settlement itself. *Id.,* at 671–674.

We granted certiorari, 524 U. S. 936 (1998), and now reverse.

## II

The nub of this case is the certification of the class under Rule 23(b)(1)(B) on a limited fund rationale, but before we reach that issue, there are two threshold matters. First,

---

[11] The Fifth Circuit denied rehearing en banc, with Judge Smith, joined by five other Circuit Judges, dissenting. *In re Asbestos Litigation,* 101 F. 3d 368, 369 (1996).

petitioners call the class claims nonjusticiable under Article III, saying that this is a feigned action initiated by Fibreboard to control its future asbestos tort liability, with the "vast majority" of the "exposure-only" class members being without injury in fact and hence without standing to sue. Brief for Petitioners 44–50. Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits. *Steel Co.* v. *Citizens For Better Environment*, 523 U. S. 83, 88–89 (1998). But the class certification issues are, as they were in *Amchem*, "logically antecedent" to Article III concerns, 521 U. S., at 612, and themselves pertain to statutory standing, which may properly be treated before Article III standing, see *Steel Co.*, *supra*, at 92. Thus the issue about Rule 23 certification should be treated first, "mindful that [the Rule's] requirements must be interpreted in keeping with Article III constraints . . . ." *Amchem, supra*, at 612–613.

Petitioners also argue that the Fifth Circuit on remand disregarded *Amchem* in passing on the Rule 23(a) issues of commonality, typicality, and adequacy of representation. Brief for Petitioners 13–22. We agree that in reinstating its affirmance of the District Court's certification decision, the Fifth Circuit fell short in its attention to *Amchem*'s explanation of the governing legal standards. Two aspects in particular of the District Court's certification should have received more detailed treatment by the Court of Appeals. First, the District Court's enquiry into both commonality and typicality focused almost entirely on the terms of the settlement. See *Ahearn*, 162 F. R. D., at 524.[12] Second, and more significantly, the District Court took no steps at the outset to ensure that the potentially conflicting interests of

---

[12] In *Amchem*, the Court found that class members' shared exposure to asbestos was insufficient to meet the demanding predominance requirements of Rule 23(b)(3). 521 U. S., at 623–624. We left open the possibility, however, that such commonality might suffice for the purposes of Rule 23(a). *Ibid.*

easily identifiable categories of claimants be protected by provisional certification of subclasses under Rule 23(c)(4), relying instead on its *post hoc* findings at the fairness hearing that these subclasses in fact had been adequately represented. As will be seen, however, these points will reappear when we review the certification on the Court of Appeals's "limited fund" theory under Rule 23(b)(1)(B). We accordingly turn directly to that.

## III

### A

Although representative suits have been recognized in various forms since the earliest days of English law, see generally S. Yeazell, From Medieval Group Litigation to the Modern Class Action (1987); see also Marcin, Searching for the Origin of the Class Action, 23 Cath. U. L. Rev. 515, 517–524 (1973), class actions as we recognize them today developed as an exception to the formal rigidity of the necessary parties rule in equity, see Hazard, Gedid, & Sowle, An Historical Analysis of the Binding Effect of Class Suits, 146 U. Pa. L. Rev. 1849, 1859–1860 (1998) (hereinafter Hazard, Gedid, & Sowle), as well as from the bill of peace, an equitable device for combining multiple suits, see Z. Chafee, Some Problems of Equity 161–167, 200–203 (1950). The necessary parties rule in equity mandated that "all persons materially interested, either as plaintiffs or defendants in the subject matter of the bill ought to be made parties to the suit, however numerous they may be." *West* v. *Randall*, 29 F. Cas. 718, 721 (No. 17,424) (CC RI) (1820) (Story, J.). But because that rule would at times unfairly deny recovery to the party before the court, equity developed exceptions, among them one to cover situations "where the parties are very numerous, and the court perceives, that it will be almost impossible to bring them all before the court; or where the question is of general interest, and a few may sue for the benefit of the whole; or where the parties form a part of a voluntary associ-

ation for public or private purposes, and may be fairly supposed to represent the rights and interests of the whole . . . ." *Id.*, at 722; see J. Story, Commentaries on Equity Pleadings § 97 (J. Gould 10th rev. ed. 1892); F. Calvert, A Treatise upon the Law Respecting Parties to Suits in Equity 17–29 (1837) (hereinafter Calvert, Parties to Suits in Equity). From these roots, modern class action practice emerged in the 1966 revision of Rule 23. In drafting Rule 23(b), the Advisory Committee sought to catalogue in "functional" terms "those recurrent life patterns which call for mass litigation through representative parties." Kaplan, A Prefatory Note, 10 B. C. Ind. & Com. L. Rev. 497 (1969).

Rule 23(b)(1)(B) speaks from "a vantage point within the class, [from which the Advisory Committee] spied out situations where lawsuits conducted with individual members of the class would have the practical if not technical effect of concluding the interests of the other members as well, or of impairing the ability of the others to protect their own interests." Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv. L. Rev. 356, 388 (1967) (hereinafter Kaplan, Continuing Work). Thus, the subdivision (read with subdivision (c)(2)) provides for certification of a class whose members have no right to withdraw, when "the prosecution of separate actions . . . would create a risk" of "adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." Fed. Rule Civ. Proc. 23(b)(1)(B).[13] Classic examples

---

[13] In contrast to class actions brought under subdivision (b)(3), in cases brought under subdivision (b)(1), Rule 23 does not provide for absent class members to receive notice and to exclude themselves from class membership as a matter of right. See 1 H. Newberg & A. Conte, Class Actions § 4.01, p. 4–6 (3d ed. 1992) (hereinafter Newberg). It is for this reason that such cases are often referred to as "mandatory" class actions.

of such a risk of impairment may, for example, be found in suits brought to reorganize fraternal-benefit societies, see, e. g., *Supreme Tribe of Ben-Hur* v. *Cauble*, 255 U. S. 356 (1921); actions by shareholders to declare a dividend or otherwise to "fix [their] rights," Kaplan, Continuing Work 388; and actions charging "a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class" of beneficiaries, requiring an accounting or similar procedure "to restore the subject of the trust," Advisory Committee's Notes on Fed. Rule Civ. Proc. 23, 28 U. S. C. App., p. 696 (hereinafter Adv. Comm. Notes). In each of these categories, the shared character of rights claimed or relief awarded entails that any individual adjudication by a class member disposes of, or substantially affects, the interests of absent class members.

Among the traditional varieties of representative suit encompassed by Rule 23(b)(1)(B) were those involving "the presence of property which call[ed] for distribution or management," J. Moore & J. Friedman, 2 Federal Practice 2240 (1938) (hereinafter Moore & Friedman). One recurring type of such suits was the limited fund class action, aggregating "claims . . . made by numerous persons against a fund insufficient to satisfy all claims." Adv. Comm. Notes 697; cf. 1 Newberg § 4.09, at 4–33 ("Classic" limited fund class actions "include claimants to trust assets, a bank account, insurance proceeds, company assets in a liquidation sale, proceeds of a ship sale in a maritime accident suit, and others").[14] The Advisory Committee cited *Dickinson* v.

---

[14] Indeed, Professor Kaplan, reporter to the Advisory Committee's 1966 revision of Rule 23, commented in a letter to another member of the Advisory Committee that the phrase " 'impair or impede the ability of the other members to protect their interests' " is "redolent of claims against a fund." Letter from Benjamin Kaplan to John P. Frank, Feb. 7, 1963, Congressional Information Service Records of the U. S. Judicial Conference, Committee on Rules of Practice and Procedure 1935–1988, No. CI–6312–31, p. 2.

Some fund-related class actions involved claims for the creation or preservation of a specific fund subject to the interests of numerous claim-

*Burnham,* 197 F. 2d 973 (CA2), cert. denied, 344 U. S. 875 (1952), as illustrative of this tradition. In *Dickinson,* investors hoping to save a failing company had contributed some $600,000, which had been misused until nothing was left but a pool of secret profits on a fraction of the original investment. In a class action, the District Court took charge of this fund, subjecting it to a constructive trust for division among subscribers who demonstrated their claims, in amounts proportional to each class member's percentage of all substantiated claims. 197 F. 2d, at 978.[15] The Second Circuit approved the class action and the distribution of the entire pool to claimants, noting that "[a]lthough none of the contributors has been paid in full, no one . . . now asserts or suggests that they should have full recovery . . . as on an ordinary tort liability for conspiracy and defrauding. The court's power of disposition over the fund was therefore ab-

ants. See, *e. g., City & County of San Francisco* v. *Market Street R. Co.,* 95 Cal. App. 2d 648, 213 P. 2d 780 (1950). The rationale in such cases for representative plaintiffs suing on behalf of all similarly situated potential parties was that benefits arising from the action necessarily inured to the class as a whole. Another type of fund case involved the adjudication of the rights of all participants in a fund in which the participants had common rights. See, *e. g., Hartford Life Ins. Co.* v. *IBS,* 237 U. S. 662 (1915); *Supreme Council of Royal Arcanum* v. *Green,* 237 U. S. 531 (1915); *Hartford Life Ins. Co.* v. *Barber,* 245 U. S. 146 (1917); see also *Smith* v. *Swormstedt,* 16 How. 288 (1854). In such cases, regardless of the size of any individual claimant's stake, the adjudication would determine the operating rules governing the fund for all participants. This category is more analogous in modern practice to class actions seeking structural injunctions and is not at issue in this case.

[15] The District Court in *Dickinson,* as was the usual practice in such cases, distributed the limited fund only after notice had been given to all class members, allowing them to come into the suit, prove their claim, and share in the recovery. See 197 F. 2d, at 978; see also Adv. Comm. Notes 697 (describing limited fund class actions as involving an "action by or against representative members to settle the validity of the claims as a whole, or in groups, followed by separate proof of the amount of each valid claim and proportionate distribution of the fund").

solute and final." *Id.*, at 980.[16] As the Advisory Committee recognized in describing *Dickinson*, equity required absent parties to be represented, joinder being impractical, where individual claims to be satisfied from the one asset would, as a practical matter, prejudice the rights of absent claimants against a fund inadequate to pay them all.

Equity, of course, recognized the same necessity to bind absent claimants to a limited fund when no formal imposition of a constructive trust was entailed. In *Guffanti* v. *National Surety Co.*, 196 N. Y. 452, 458, 90 N. E. 174, 176 (1909), for example, the defendant received money to supply steamship tickets and had posted a $15,000 bond as required by state law. He converted to personal use funds collected from more than 150 ticket purchasers, was then adjudged bankrupt, and absconded. One of the defrauded ticket purchasers sued the surety in equity on behalf of himself and all others like him. Over the defendant's objection, the New York Court of Appeals sustained the equitable class suit, citing among other considerations the fact that all recovery had to come from a "limited fund out of which the aggregate recoveries must be sought" that was inadequate to pay all claims, and subject to pro rata distribution. *Id.*, at 458, 90 N. E., at 176. See Hazard, Gedid, & Sowle 1915 *("[Guffanti]*

---

[16] As *Dickinson* demonstrates, the immediate precursor to the type of limited fund class action invoked in this case was a subset of "hybrid" class actions under the 1938 version of Rule 23. Cf. 1 Newberg § 1.09, at 1–25. The original Rule 23 categorized class actions by "the character of the right sought to be enforced for or against the class," dividing such actions into "(1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it; (2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or (3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought." Fed. Rule Civ. Proc. 23(a) (1938 ed., Supp. V). See Moore & Friedman 2240; see also Moore & Cohn, Federal Class Actions, 32 Ill. L. Rev. 307, 317–318 (1937); Moore, Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft, 25 Geo. L. J. 551, 574 (1937).

explained that when a debtor's assets were less than the total of the creditors' claims, a binding class action was not only permitted but was required; otherwise some creditors (the parties) would be paid and others (the absentees) would not"). See also *Morrison* v. *Warren* 174 Misc. 233, 234, 20 N. Y. S. 2d 26, 27 (Sup. Ct. N. Y. Cty. 1940) (suit on behalf of more than 400 beneficiaries of an insurance policy following a fire appropriate where "the amount of the claims . . . greatly exceeds the amount of the insurance"); *National Surety Co.* v. *Graves*, 211 Ala. 533, 534, 101 So. 190 (1924) (suit against a surety company by stockholders "for the benefit of themselves and all others similarly situate who will join the suit" where it was alleged that individual suits were being filed on surety bonds that "would result in the exhaustion of the penalties of the bonds, leaving many stockholders without remedy").

*Ross* v. *Crary*, 1 Paige Ch. 416, 417–418 (N. Y. Ch. 1829), presents the concept of the limited fund class action in another incarnation. "[D]ivers suits for general legacies," *id.*, at 417, were brought by various legatees against the executor of a decedent's estate. The *Ross* court stated that where "there is an allegation of a deficiency of the fund, so that an account of the estate is necessary," the court will "direc[t] an account in one cause only" and "stay the proceeding[s] in the others, leaving all the parties interested in the fund, to come in under the decree." *Id.*, at 417–418. Thus, in equity, legatee and creditor bills against the assets of a decedent's estate had to be brought on behalf of all similarly situated claimants where it was clear from the pleadings that the available portion of the estate could not satisfy the aggregate claims against it.[17]

---

[17] In early creditors' bills, for example, equity would order a master to call for all creditors to prove their debts, to take account of the entire estate, and to apply the estate in payment of the debts. See 1 J. Story, Commentaries on Equity Jurisprudence §§ 547, 548 (I. Redfield 8th rev. ed. 1861). This decree, with its equitable benefit and incorporation of all

## B

The cases forming this pedigree of the limited fund class action as understood by the drafters of Rule 23 have a number of common characteristics, despite the variety of circumstances from which they arose. The points of resemblance are not necessarily the points of contention resolved in the particular cases, but they show what the Advisory Committee must have assumed would be at least a sufficient set of conditions to justify binding absent members of a class under Rule 23(b)(1)(B), from which no one has the right to secede.

The first and most distinctive characteristic is that the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims. The concept driving this type of suit was insufficiency, which alone justified the limit on an early feast to avoid a later famine. See, e. g., *Guffanti, supra,* at 457, 90 N. E., at 176 ("The total amount of the claims exceeds the penalty of the bond . . . . A just and equitable payment from the bond would be a distribution *pro rata* upon the amount of the several embezzlements. Unless in a case like this the amount

---

creditors was not, however, available when the executor of the estate admitted assets sufficient to cover its debts, because where assets were not limited, no prejudice to the other creditors would result from the simple payment of the debt to the creditor who brought the bill. See *Woodgate* v. *Field,* 2 Hare 211, 213, 67 Eng. Rep. 88, 89 (Ch. 1842) ("The reason for . . . the usual form of decree . . . has no application where assets are admitted, for the executor thereby makes himself liable to the payment of the debt. In such a case, the other creditors cannot be prejudiced by a decree for payment of the Plaintiff's debt; and the object of the special form of the decree in a creditors' suit fails"); see also *Hallett* v. *Hallett,* 2 Paige 15, 21 (N. Y. 1829) ("[I]f by the answer of the defendant [in a creditors' or legatees' suit] it appears there will be a deficiency of assets so that all the creditors cannot be paid in full, or that there must be an abatement of the complainant's legacy, the court will make a decree for the general administration of the estate, and a distribution of the same among the several parties entitled thereto, agreeable to equity").

of the bond is so distributed among the persons having claims which are secured thereby, it must necessarily result in a scramble for precedence in payment, and the amount of the bond may be paid to the favored, or to those first obtaining knowledge of the embezzlements"); *Graves, supra,* at 534, 101 So., at 190 ("The primary equity of the bill is the adjustment of claims and the equitable apportionment of a fund provided by law, which is insufficient to pay claimants in full"). The equity of the limitation is its necessity.

Second, the whole of the inadequate fund was to be devoted to the overwhelming claims. See, *e. g., Dickinson,* 197 F. 2d, at 979–980 (rejecting a challenge by holder of funds to the court's disposition of the entire fund); see also *United States* v. *Butterworth-Judson Corp.,* 269 U. S. 504, 513 (1926) ("Here, the fund being less than the debts, the creditors are entitled to have all of it distributed among them according to their rights and priorities"). It went without saying that the defendant or estate or constructive trustee with the inadequate assets had no opportunity to benefit himself or claimants of lower priority by holding back on the amount distributed to the class. The limited fund cases thus ensured that the class as a whole was given the best deal; they did not give a defendant a better deal than *seriatim* litigation would have produced.

Third, the claimants identified by a common theory of recovery were treated equitably among themselves. The cases assume that the class will comprise everyone who might state a claim on a single or repeated set of facts, invoking a common theory of recovery, to be satisfied from the limited fund as the source of payment. Each of the people represented in *Ross,* for example, had comparable entitlement as a legatee under the testator's will. Those subject to representation in *Dickinson* had a common source of claims in the solicitation of funds by parties whose subsequent defalcation left them without their investment, while in *Guffanti* the individuals represented had each entrusted

money for ticket purchases. In these cases the hope of re-covery was limited, respectively, by estate assets, the resid-uum of profits, and the amount of the bond. Once the repre-sented classes were so identified, there was no question of omitting anyone whose claim shared the common theory of liability and would contribute to the calculated shortfall of recovery. See *Railroad Co.* v. *Orr*, 18 Wall. 471, 474 (1873) (reciting the "well settled" general rule "that when it ap-pears on the face of the bill that there will be a deficiency in the fund, and that there are other creditors or legatees who are entitled to a ratable distribution with the complainants, and who have a common interest with them, such creditors or legatees should be made parties to the bill, or the suit should be brought by the complainants in behalf of them-selves and all others standing in a similar situation"). The plaintiff appeared on behalf of all similarly situated parties, see Calvert, Parties to Suits in Equity 24 ("[I]t is not suffi-cient that the plaintiff appear on behalf of numerous parties: the rule seems to be, that he must appear on behalf of all who are interested"); thus, the creditors' bill was brought on behalf of all creditors, cf. *Leigh* v. *Thomas*, 2 Ves. Sen. 312, 313, 28 Eng. Rep. 201 (Ch. 1751) ("No doubt but a bill may be by a few creditors in behalf of themselves and the rest . . . but there is no instance of a bill by three or four to have an account of the estate, without saying they bring it in behalf of themselves and the rest of the creditors"), the constructive trust was asserted on behalf of all victims of the fraud, and the surety suit was brought on behalf of all entitled to a share of the bond.[18] Once all similar claims

---

[18] Professor Chafee explained, in discussing bills of peace, that where a case presents a limited fund, "it is impossible to make a fair distribution of the fund or limited liability to all members of the multitude except in a single proceeding where the claim of each can be adjudicated with due reference to the claims of the rest. The fund or limited liability is like a mince pie, which can not be satisfactorily divided until the carver counts

were brought directly or by representation before the court, these antecedents of the mandatory class action presented straightforward models of equitable treatment, with the simple equity of a pro rata distribution providing the required fairness, see 1 J. Pomeroy, Equity Jurisprudence § 407, pp. 764–765 (4th ed. 1918) ("[I]f the fund is not sufficient to discharge all claims upon it in full . . . equity will incline to regard all the demands as standing upon an equal footing, and will decree a *pro rata* distribution or payment").[19]

In sum, mandatory class treatment through representative actions on a limited fund theory was justified with reference to a "fund" with a definitely ascertained limit, all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution.

## C

The Advisory Committee, and presumably the Congress in approving subdivision (b)(1)(B), must have assumed that an action with these characteristics would satisfy the limited

---

the number of persons at the table." Bills of Peace with Multiple Parties, 45 Harv. L. Rev. 1297, 1311 (1932).

[19] As noted above, traditional limited fund class actions typically provided notice to all claimants and the opportunity for those claimants to establish their claims before the actual distribution took place. See, *e. g., Dickinson v. Burnham,* 197 F. 2d 973, 978 (CA2 1952); *Terry v. President and Directors of the Bank of Cape Fear,* 20 F. 777, 782 (CC WDNC 1884); cf. *Johnson v. Waters,* 111 U. S. 640, 674 (1884) (in a creditors' bill, "it is the usual and correct course to open a reference in the master's office and to give other creditors, having valid claims against the fund, an opportunity to come in and have the benefit of the decree"). Rule 23, however, specifies no notice requirement for subdivision (b)(1)(B) actions beyond that required by subdivision (e) for settlement purposes. Plaintiffs in this case made an attempt to notify all presently identifiable class members in connection with the fairness hearing, though the adequacy of the effort is disputed. Since satisfaction or not of a notice requirement would not affect the disposition of this case, we express no opinion on the need for notice or the sufficiency of the effort to give it in this case.

fund rationale cognizable under that subdivision. The question remains how far the same characteristics are necessary for limited fund treatment. While we cannot settle all the details of a subdivision (b)(1)(B) limited fund here (and so cannot decide the ultimate question whether settlements of multitudes of related tort actions are amenable to mandatory class treatment), there are good reasons to treat these characteristics as presumptively necessary, and not merely sufficient, to satisfy the limited fund rationale for a mandatory action. At the least, the burden of justification rests on the proponent of any departure from the traditional norm.

It is true, of course, that the text of Rule 23(b)(1)(B) is on its face open to a more lenient limited fund concept, just as it covers more historical antecedents than the limited fund. But the greater the leniency in departing from the historical limited fund model, the greater the likelihood of abuse in ways that will be apparent when we apply the limited fund criteria to the case before us. The prudent course, therefore, is to presume that when subdivision (b)(1)(B) was devised to cover limited fund actions, the object was to stay close to the historical model. As will be seen, this limiting construction finds support in the Advisory Committee's expressions of understanding, minimizes potential conflict with the Rules Enabling Act, and avoids serious constitutional concerns raised by the mandatory class resolution of individual legal claims, especially where a case seeks to resolve future liability in a settlement-only action.

To begin with, the Advisory Committee looked cautiously at the potential for creativity under Rule 23(b)(1)(B), at least in comparison with Rule 23(b)(3). Although the Committee crafted all three subdivisions of the Rule in general, practical terms, without the formalism that had bedeviled the original Rule 23, see Kaplan, Continuing Work 380–386, the Committee was consciously retrospective with intent to codify pre-Rule categories under Rule 23(b)(1), not forward looking as it was in anticipating innovations under Rule 23(b)(3). Com-

pare Civil Rules Advisory Committee Meeting, Oct. 31–Nov. 2, 1963, Congressional Information Service Records of the U. S. Judicial Conference, Committee on Rules of Practice and Procedure 1935–1988, No. CI–7104–53, p. 11 (hereinafter Civil Rules Meeting) (comments of Reporter Kaplan) (Rule 23(b)(3) represents "the growing point of the law"); *id.*, at 16 (comments of Committee Member Prof. Albert M. Sacks) (Rule 23(b)(3) is "an evolving area"). Thus, the Committee intended subdivision (b)(1) to capture the " 'standard' " class actions recognized in pre-Rule practice, Kaplan, Continuing Work 394.

Consistent with its backward look under subdivision (b)(1), as commentators have pointed out, it is clear that the Advisory Committee did not contemplate that the mandatory class action codified in subdivision (b)(1)(B) would be used to aggregate unliquidated tort claims on a limited fund rationale. See Monaghan, Antisuit Injunctions and Preclusion Against Absent Nonresident Class Members, 98 Colum. L. Rev. 1148, 1164 (1998) ("The 'framers' of Rule 23 did not envision the expansive interpretations of the rule that have emerged . . . . No draftsmen contemplated that, in mass torts, (b)(1)(B) 'limited fund' classes would emerge as the functional equivalent to bankruptcy by embracing 'funds' created by the litigation itself"); see also Schwarzer, Settlement of Mass Tort Class Actions: Order Out of Chaos, 80 Cornell L. Rev. 837, 840 (1995) ("The original concept of the limited fund class does not readily fit the situation where a large volume of claims might eventually result in judgments that in the aggregate could exceed the assets available to satisfy them"); Marcus, They Can't Do That, Can They? Tort Reform Via Rule 23, 80 Cornell L. Rev. 858, 877 (1995). None of the examples cited in the Advisory Committee Notes or by Professor Kaplan in explaining Rule 23(b)(1)(B) remotely approach what was then described as a "mass accident" case. While the Advisory Committee focused much attention on the amenability of Rule 23(b)(3) to such cases,

the Committee's debates are silent about resolving tort claims under a mandatory limited fund rationale under Rule 23(b)(1)(B).[20] It is simply implausible that the Advisory Committee, so concerned about the potential difficulties posed by dealing with mass tort cases under Rule 23(b)(3), with its provisions for notice and the right to opt out, see Rule 23(c)(2), would have uncritically assumed that mandatory versions of such class actions, lacking such protections, could be certified under Rule 23(b)(1)(B).[21] We do not, it is true, decide the ultimate question whether Rule 23(b)(1)(B) may ever be used to aggregate individual tort claims, cf. *Ticor Title Ins. Co.* v. *Brown*, 511 U. S. 117, 121 (1994)

---

[20] To the extent that members of the Advisory Committee explicitly considered cases resembling the current mass tort limited fund class action, they did so in the context of the debate about bringing "mass accident" class actions under Rule 23(b)(3). There was much concern on the Advisory Committee about the degree to which subdivision (b)(3), which the Committee was drafting to replace the old spurious class action category, would be applied to "mass accident" cases. Compare, *e. g.*, Civil Rules Meeting 9, 14, with, *e. g., id.*, at 13, 44–45. See also *id.*, at 51. As a compromise, the Advisory Committee Notes state that a "'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways." Adv. Comm. Notes 697. See also Kaplan, Continuing Work 393.

[21] The Advisory Committee noted, moreover, that "[w]here the class-action character of the lawsuit is based solely on the existence of a 'limited fund,' the judgment, while extending to all claims of class members against the fund, has ordinarily left unaffected the personal claims of non-appearing members against the debtor." Adv. Comm. Notes 698. Cf. Bone, Personal and Impersonal Litigative Forms: Reconceiving the History of Adjudicative Representation, 70 B. U. L. Rev. 213, 282 (1990) (historically suits involving individual claims in the absence of a common fund did not automatically bind class members, instead providing a mechanism for notice and the opportunity to join the suit). This recognition underscores doubt that the Advisory Committee would have intended liberality in allowing such a circumscribed tradition to be transmogrified by operation of Rule 23(b)(1)(B) into a mechanism for resolving the claims of individuals not only against the fund, but also against an individual tortfeasor.

*(per curiam)*. But we do recognize that the Committee would have thought such an application of the Rule surprising, and take this as a good reason to limit any surprise by presuming that the Rule's historical antecedents identify requirements.

The Rules Enabling Act underscores the need for caution. As we said in *Amchem*, no reading of the Rule can ignore the Act's mandate that "rules of procedure 'shall not abridge, enlarge or modify any substantive right,'" *Amchem*, 521 U. S., at 613 (quoting 28 U. S. C. § 2072(b)); cf. *Guaranty Trust Co. v. York*, 326 U. S. 99, 105 (1945) ("In giving federal courts 'cognizance' of equity suits in cases of diversity jurisdiction, Congress never gave, nor did the federal courts ever claim, the power to deny substantive rights created by State law or to create substantive rights denied by State law"). Petitioners argue that the Act has been violated here, asserting that the Global Settlement Agreement's priorities of claims and compromise of full recovery abrogated the state law that must govern this diversity action under 28 U. S. C. § 1652. See Brief for Petitioners 31–36. Although we need not grapple with the difficult choice-of-law and substantive state-law questions raised by petitioners' assertion, we do need to recognize the tension between the limited fund class action's pro rata distribution in equity and the rights of individual tort victims at law. Even if we assume that some such tension is acceptable under the Rules Enabling Act, it is best kept within tolerable limits by keeping limited fund practice under Rule 23(b)(1)(B) close to the practice preceding its adoption.

Finally, if we needed further counsel against adventurous application of Rule 23(b)(1)(B), the Rules Enabling Act and the general doctrine of constitutional avoidance would jointly sound a warning of the serious constitutional concerns that come with any attempt to aggregate individual tort claims on a limited fund rationale. First, the certification of a mandatory class followed by settlement of its action for money

damages obviously implicates the Seventh Amendment jury trial rights of absent class members.[22]   We noted in *Ross* v. *Bernhard*, 396 U. S. 531 (1970), that since the merger of law and equity in 1938, it has become settled among the lower courts that "class action plaintiffs may obtain a jury trial on any legal issues they present." *Id.*, at 541.   By its nature, however, a mandatory settlement-only class action with legal issues and future claimants compromises their Seventh Amendment rights without their consent.

Second, and no less important, mandatory class actions aggregating damages claims implicate the due process "principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process," *Hansberry* v. *Lee*, 311 U. S. 32, 40 (1940), it being "our 'deep-rooted historic tradition that everyone should have his own day in court,'" *Martin* v. *Wilks*, 490 U. S. 755, 762 (1989) (quoting 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4449, p. 417 (1981)); see *Richards* v. *Jefferson County*, 517 U. S. 793, 798–799 (1996).   Although " '[w]e have recognized an exception to the general rule when, in certain limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party," or "where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate," *Martin, supra,* at 762, n. 2 (citations omitted), the burden of justification rests on the exception.

The inherent tension between representative suits and the day-in-court ideal is only magnified if applied to damages claims gathered in a mandatory class.   Unlike Rule 23(b)(3) class members, objectors to the collectivism of a mandatory

---

[22] The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."

subdivision (b)(1)(B) action have no inherent right to abstain. The legal rights of absent class members (which in a class like this one would include claimants who by definition may be unidentifiable when the class is certified) are resolved regardless of either their consent, or, in a class with objectors, their express wish to the contrary.[23]   And in settlement-only class actions the procedural protections built into the Rule to protect the rights of absent class members during litigation are never invoked in an adversarial setting, see *Amchem, supra,* at 620.

In related circumstances, we raised the flag on this issue of due process more than a decade ago in *Phillips Petroleum Co.* v. *Shutts,* 472 U. S. 797 (1985).   *Shutts* was a state class action for small sums of interest on royalty payments suspended on the authority of a federal regulation.   *Id.,* at 800. After certification of the class, the named plaintiffs notified each member by first-class mail of the right to opt out of the lawsuit.   Out of a class of 33,000, some 3,400 exercised that right, and another 1,500 were excluded because their notices could not be delivered.   *Id.,* at 801.   After losing at trial, the defendant, Phillips Petroleum, argued that the state court had no jurisdiction over claims of out-of-state plaintiffs without their affirmative consent.   We said no and held that out-of-state plaintiffs could not invoke the same due process limits on personal jurisdiction that out-of-state defendants had under *International Shoe Co.* v. *Washington,* 326 U. S.

---

[23] It is no answer in this case that the settlement agreement provided for a limited, back-end "opt out" in the form of a right on the part of class members eventually to take their case to court if dissatisfied with the amount provided by the trust.   The "opt out" in this case requires claimants to exhaust a variety of alternative dispute mechanisms, to bring suit against the trust, and not against Fibreboard, and it limits damages to $500,000, to be paid out in installments over 5 to 10 years, see *supra,* at 827, despite multimillion-dollar jury verdicts sometimes reached in asbestos suits, *In re Asbestos Litigation,* 90 F. 3d, at 1006–1007, n. 30 (Smith, J., dissenting).   Indeed, on approximately a dozen occasions, Fibreboard had settled for more than $500,000.   See App. to Pet. for Cert. 373a.

310 (1945), and its progeny. 472 U. S., at 806–808. But we also saw that before an absent class member's right of action was extinguishable due process required that the member "receive notice plus an opportunity to be heard and participate in the litigation," and we said that "at a minimum . . . an absent plaintiff [must] be provided with an opportunity to remove himself from the class." *Id.*, at 812.[24]

## IV

The record on which the District Court rested its certification of the class for the purpose of the global settlement did not support the essential premises of mandatory limited fund actions. It failed to demonstrate that the fund was limited except by the agreement of the parties, and it showed exclusions from the class and allocations of assets at odds with the concept of limited fund treatment and the structural protections of Rule 23(a) explained in *Amchem.*

## A

The defect of certification going to the most characteristic feature of a limited fund action was the uncritical adoption by both the District Court and the Court of Appeals of figures[25] agreed upon by the parties in defining the limits of the fund and demonstrating its inadequacy.[26] When a dis-

---

[24] We also reiterated the constitutional requirement articulated in *Hansberry* v. *Lee*, 311 U. S. 32 (1940), that "the named plaintiff at all times adequately represent the interests of the absent class members." *Phillips Petroleum Co.* v. *Shutts*, 472 U. S., at 812 (citing *Hansberry, supra,* at 42–43, 45). In *Shutts*, as an important caveat to our holding, we made clear that we were only examining the procedural protections attendant on binding out-of-state class members whose claims were "wholly or predominately for money judgments," 472 U. S., at 811, n. 3.

[25] The plural reflects the fact that the insurers agreed to provide $1.525 billion under the Global Settlement Agreement and $2 billion under the Trilateral Settlement Agreement.

[26] The federal courts have differed somewhat in articulating the standard to evaluate whether, in fact, a fund is limited, in cases involving mass torts. Compare, *e. g., In re Northern Dist. of California, Dalkon Shield*

trict court, as here, certifies for class action settlement only, the moment of certification requires "heightene[d] attention," *Amchem*, 521 U. S., at 620, to the justifications for binding the class members. This is so because certification of a mandatory settlement class, however provisional technically, effectively concludes the proceeding save for the final fairness hearing. And, as we held in *Amchem*, a fairness hearing under Rule 23(e) is no substitute for rigorous adherence to those provisions of the Rule "designed to protect absentees," *ibid.*, among them subdivision (b)(1)(B).[27] Thus, in an action such as this the settling parties must present not only their agreement, but evidence on which the district court may ascertain the limit and the insufficiency of the fund, with support in findings of fact following a proceeding in which the evidence is subject to challenge, see *In re Bendectin Products Liability Litigation*, 749 F. 2d 300, 306 (CA6 1984) ("[T]he district court, as a matter of law, must have a fact-finding inquiry on this question and allow the opponents of class certification to present evidence that a limited fund

*IUD Products Liability Litigation*, 693 F. 2d 847, 852 (CA9 1982), cert. denied *sub nom. A. H. Robins Co., Inc.* v. *Abed*, 459 U. S. 1171 (1983) (class proponents must demonstrate that allowing the adjudication of individual claims will inescapably compromise the claims of absent class members), with, *e. g., In re "Agent Orange" Product Liability Litigation*, 100 F. R. D. 718, 726 (EDNY 1983), aff'd 818 F. 2d 145 (CA2 1987), cert. denied *sub nom. Fraticelli et al.* v. *Dow Chemical Co. et al.*, 484 U. S. 1004 (1988) (requiring only a "substantial probability—that is less than a preponderance but more than a mere possibility—that if damages are awarded, the claims of earlier litigants would exhaust the defendants' assets"). Cf. *In re Bendectin Products Liability Litigation*, 749 F. 2d 300, 306 (CA6 1984). Because under either formulation, the class certification in this case cannot stand, it would be premature to decide the appropriate standard at this time.

[27] See Issacharoff, Class Action Conflicts, 30 U. C. D. L. Rev. 805, 822 (1997) ("[I]n the context of a mandatory *settlement* class, the individual class member is presented with what purports to be a binding *fait accompli*, with the only recourse a likely futile objection at the fairness hearing required by Rule 23(e)").

does not exist"); see also *In re Temple*, 851 F. 2d 1269, 1272 (CA11 1988) ("Without a finding as to the net worth of the defendant, it is difficult to see how the fact of a limited fund could have been established given that all of [the defendant's] assets are potentially available to suitors"); *In re Dennis Greenman Securities Litigation*, 829 F. 2d 1539, 1546 (CA11 1987) (discussing factual findings necessary for certification of a limited fund class action).

We have already alluded to the difficulties facing limited fund treatment of huge numbers of actions for unliquidated damages arising from mass torts, the first such hurdle being a computation of the total claims. It is simply not a matter of adding up the liquidated amounts, as in the models of limited fund actions. Although we might assume, *arguendo*, that prior judicial experience with asbestos claims would allow a court to make a sufficiently reliable determination of the probable total, the District Court here apparently thought otherwise, concluding that "there is no way to predict Fibreboard's future asbestos liability with any certainty." 162 F. R. D., at 528. Nothing turns on this conclusion, however, since there was no adequate demonstration of the second element required for limited fund treatment, the upper limit of the fund itself, without which no showing of insufficiency is possible.

The "fund" in this case comprised both the general assets of Fibreboard and the insurance assets provided by the two policies, see 90 F. 3d, at 982 (describing the fund as Fibreboard's entire equity and $2 billion in insurance assets under the Trilateral Settlement Agreement). As to Fibreboard's assets exclusive of the contested insurance, the District Court and the Fifth Circuit concluded that Fibreboard had a then-current sale value of $235 million that could be devoted to the limited fund. While that estimate may have been conservative,[28] at least the District Court heard evi-

---

[28] The District Court based the $235 million figure on evidence provided by an investment banker regarding what a "financially prudent buyer" would pay to acquire Fibreboard free of its personal injury asbestos liabili-

dence and made an independent finding at some point in the proceedings. The same, however, cannot be said for the value of the disputed insurance.

The insurance assets would obviously be "limited" in the traditional sense if the total of demonstrable claims would render the insurers insolvent, or if the policies provided aggregate limits falling short of that total; calculation might be difficult, but the way to demonstrate the limit would be clear. Neither possibility is presented in this case, however. Instead, any limit of the insurance asset here had to be a product of potentially unlimited policy coverage discounted by the risk that Fibreboard would ultimately lose the coverage dispute litigation. This sense of limit as a value discounted by risk is of course a step removed from the historical model, but even on the assumption that it would suffice for limited fund treatment, there was no adequate finding of fact to support its application here. Instead of undertaking an independent evaluation of potential insurance funds, the District Court (and, later, the Court of Appeals), simply accepted the $2 billion Trilateral Settlement Agreement figure as representing the maximum amount the insurance companies could be required to pay tort victims, concluding that "[w]here insurance coverage is disputed, it is appropriate to value the insurance asset at a settlement value." App. to Pet. for Cert. 492a.[29]

_____

ties, less transaction costs. App. to Pet. for Cert. 377a, 492a. In 1997, however, Fibreboard was acquired for about $515 million, plus $85 million of assumed debt. See *In re Asbestos Litigation*, 134 F. 3d 668, 674 (CA5 1998) (Smith, J., dissenting); see also Coffee, Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343, 1402 (1995) (noting the surge in Fibreboard's stock price following the settlement below).

[29] In describing possible limited funds in this case, the District Court discounted the $2 billion Trilateral Settlement Agreement figure by the amount necessary to resolve present claims included in neither the inventory settlements nor the global class claims and other items, yielding a figure equal to the $1.535 billion available under the Global Settlement Agreement. App. to Pet. for Cert. 492a. The Court of Appeals, by contrast, assumed that the full $2 billion represented by the Trilateral Settle-

Settlement value is not always acceptable, however. One may take a settlement amount as good evidence of the maximum available if one can assume that parties of equal knowledge and negotiating skill agreed upon the figure through arms-length bargaining, unhindered by any considerations tugging against the interests of the parties ostensibly represented in the negotiation. But no such assumption may be indulged in this case, or probably in any class action settlement with the potential for gigantic fees.[30] In this case, certainly, any assumption that plaintiffs' counsel could be of a mind to do their simple best in bargaining for the benefit of the settlement class is patently at odds with the fact that at least some of the same lawyers representing plaintiffs and the class had also negotiated the separate settlement of 45,000 pending claims, 90 F. 3d, at 969–970, 971, the full payment of which was contingent on a successful Global Settlement Agreement or the successful resolution of the insurance coverage dispute (either by litigation or by agreement, as eventually occurred in the Trilateral Settlement Agreement), id., at 971, n. 3; App. 119a–120a. Class counsel thus had great incentive to reach any agreement in the global settlement negotiations that they thought might survive a Rule 23(e) fairness hearing, rather than the best possible arrangement for the substantially unidentified global settlement class. Cf. Cramton, Individualized Justice, Mass

---

ment Agreement would be available to class claims. *In re Asbestos Litigation*, 90 F. 3d, at 982. The Court of Appeals provided no explanation for using the higher figure in light of the District Court's conclusion that only $1.535 billion of the $2 billion Trilateral Settlement Agreement figure would actually be available to the class. Either way, the figure represented only the amount the insurance companies agreed to pay, and not an independent evaluation of the limits of their payment obligations.

[30] In a strictly rational world, plaintiffs' counsel would always press for the limit of what the defense would pay. But with an already enormous fee within counsel's grasp, zeal for the client may relax sooner than it would in a case brought on behalf of one claimant.

Torts, and "Settlement Class Actions": An Introduction, 80 Cornell L. Rev. 811, 832 (1995) ("[S]ide settlements suggest that class counsel has been laboring under an impermissible conflict of interest and that it may have preferred the interests of current clients to those of the future claimants in the settlement class"). The resulting incentive to favor the known plaintiffs in the earlier settlement was, indeed, an egregious example of the conflict noted in *Amchem* resulting from divergent interests of the presently injured and future claimants. See 521 U. S., at 626–627 (discussing adequacy of named representatives under Rule 23(a)(4)).

We do not, of course, know exactly what an independent valuation of the limit of the insurance assets would have shown. It might have revealed that even on the assumption that Fibreboard's coverage claim was sound, there would be insufficient assets to pay claims, considered with reference to their probable timing; if Fibreboard's own assets would not have been enough to pay the insurance shortfall plus any claims in excess of policy limits, the projected insolvency of the insurers and Fibreboard would have indicated a truly limited fund. (Nothing in the record, however, suggests that this would have been a supportable finding.) Or an independent valuation might have revealed assets of insufficient value to pay all projected claims if the assets were discounted by the prospects that the insurers would win the coverage cases. Or the court's independent valuation might have shown, discount or no discount, the probability of enough assets to pay all projected claims, precluding certification of any mandatory class on a limited fund rationale. Throughout this litigation the courts have accepted the assumption that the third possibility was out of the question, and they may have been right. But objecting and unidentified class members alike are entitled to have the issue settled by specific evidentiary findings independent of the agreement of defendants and conflicted class counsel.

B

The explanation of need for independent determination of the fund has necessarily anticipated our application of the requirement of equity among members of the class. There are two issues, the inclusiveness of the class and the fairness of distributions to those within it. On each, this certification for settlement fell short.

The definition of the class excludes myriad claimants with causes of action, or foreseeable causes of action, arising from exposure to Fibreboard asbestos. While the class includes those with present claims never filed, present claims withdrawn without prejudice, and future claimants, it fails to include those who had previously settled with Fibreboard while retaining the right to sue again "upon development of an asbestos related malignancy," plaintiffs with claims pending against Fibreboard at the time of the initial announcement of the Global Settlement Agreement, and the plaintiffs in the "inventory" claims settled as a supposedly necessary step in reaching the global settlement, see 90 F. 3d, at 971. The number of those outside the class who settled with a reservation of rights may be uncertain, but there is no such uncertainty about the significance of the settlement's exclusion of the 45,000 inventory plaintiffs and the plaintiffs in the unsettled present cases, estimated by the Guardian Ad Litem at more than 53,000 as of August 27, 1993, see App. in No. 95–40635 (CA5), 6 Record, Tab 55, p. 72 (Report of the Guardian Ad Litem). It is a fair question how far a natural class may be depleted by prior dispositions of claims and still qualify as a mandatory limited fund class, but there can be no question that such a mandatory settlement class will not qualify when in the very negotiations aimed at a class settlement, class counsel agree to exclude what could turn out to be as much as a third of the claimants that negotiators thought might eventually be involved, a substantial number of whom class counsel represent, see App. to Pet. for Cert.

321a (noting that the parties negotiating the global settlement agreed to use a negotiating benchmark of 186,000 future claims against Fibreboard).

Might such class exclusions be forgiven if it were shown that the class members with present claims and the outsiders ended up with comparable benefits? The question is academic here. On the record before us, we cannot speculate on how the unsettled claims would fare if the global settlement were approved, or under the trilateral settlement. As for the settled inventory claims, their plaintiffs appeared to have obtained better terms than the class members. They received an immediate payment of 50 percent of a settlement higher than the historical average, and would get the remainder if the global settlement were sustained (or the coverage litigation resolved, as it turned out to be by the Trilateral Settlement Agreement); the class members, by contrast, would be assured of a 3-year payout for claims settled, whereas the unsettled faced a prospect of mediation followed by arbitration as prior conditions of instituting suit, which would even then be subject to a recovery limit, a slower payout, and the limitations of the trust's spendthrift protection. See *supra*, at 827. Finally, as discussed below, even ostensible parity between settling nonclass plaintiffs and class members would be insufficient to overcome the failure to provide the structural protection of independent representation as for subclasses with conflicting interests.

On the second element of equity within the class, the fairness of the distribution of the fund among class members, the settlement certification is likewise deficient. Fair treatment in the older cases was characteristically assured by straightforward pro rata distribution of the limited fund. See *supra*, at 841. While equity in such a simple sense is unattainable in a settlement covering present claims not specifically proven and claims not even due to arise, if at all, until some future time, at the least such a settlement must

seek equity by providing for procedures to resolve the difficult issues of treating such differently situated claimants with fairness as among themselves.

First, it is obvious after *Amchem* that a class divided between holders of present and future claims (some of the latter involving no physical injury and attributable to claimants not yet born) requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel. See *Amchem,* 521 U. S., at 627 (class settlements must provide "structural assurance of fair and adequate representation for the diverse groups and individuals affected"); cf. 5 J. Moore, T. Chorvat, D. Feinberg, R. Marmer, & J. Solovy, Moore's Federal Practice § 23.25[5][e], p. 23–149 (3d ed. 1998) (an attorney who represents another class against the same defendant may not serve as class counsel).[31]  As we said in *Amchem,* "for the currently injured, the critical goal is generous immediate payments," but "[t]hat goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future." 521 U. S., at 626. No such procedure was employed here, and the conflict was as contrary to the equitable obligation entailed by the limited fund

---

[31] This adequacy of representation concern parallels the enquiry required at the threshold under Rule 23(a)(4), but as we indicated in *Amchem,* the same concerns that drive the threshold findings under Rule 23(a) may also influence the propriety of the certification decision under the subdivisions of Rule 23(b).  See *Amchem,* 521 U. S., at 623, n. 18.

In *Amchem,* we concentrated on the adequacy of named plaintiffs, but we recognized that the adequacy of representation enquiry is also concerned with the "competency and conflicts of class counsel." *Id.,* at 626, n. 20 (citing *General Telephone Co. of Southwest* v. *Falcon,* 457 U. S. 147, 157–158, n. 13 (1982)); see also 5 Moore's Federal Practice § 23.25[3][a] (adequacy of representation concerns named plaintiff and class counsel).  In this case, of course, the named representatives were not even "named [until] after the agreement in principle was reached," App. to Pet. for Cert. 483a; and they then relied on class counsel in subsequent settlement negotiations, *ibid.*

rationale as it was to the requirements of structural protection applicable to all class actions under Rule 23(a)(4).

Second, the class included those exposed to Fibreboard's asbestos products both before and after 1959. The date is significant, for that year saw the expiration of Fibreboard's insurance policy with Continental, the one that provided the bulk of the insurance funds for the settlement. Pre-1959 claimants accordingly had more valuable claims than post-1959 claimants, see 90 F. 3d, at 1012–1013 (Smith, J., dissenting), the consequence being a second instance of disparate interests within the certified class. While at some point there must be an end to reclassification with separate counsel, these two instances of conflict are well within the requirement of structural protection recognized in *Amchem*.

It is no answer to say, as the Fifth Circuit said on remand, that these conflicts may be ignored because the settlement makes no disparate allocation of resources as between the conflicting classes. See 134 F. 3d, at 669–670. The settlement decides that the claims of the immediately injured deserve no provisions more favorable than the more speculative claims of those projected to have future injuries, and that liability subject to indemnification is no different from liability with no indemnification. The very decision to treat them all the same is itself an allocation decision with results almost certainly different from the results that those with immediate injuries or claims of indemnified liability would have chosen.

Nor does it answer the settlement's failures to provide structural protections in the service of equity to argue that the certified class members' common interest in securing contested insurance funds for the payment of claims was so weighty as to diminish the deficiencies beneath recognition here. See Brief for Respondent Class Representatives Ahearn et al. 31 (discussing this issue in the context of the Rule 23(a)(4) adequacy of representation requirement); *id.*,

858

at 35–36 (citing, *e. g., In re "Agent Orange" Product Liability Litigation*, 996 F. 2d 1425, 1435–1436 (CA2 1993); *In re "Agent Orange" Product Liability Litigation*, 800 F. 2d 14, 18–19 (CA2 1986)). This argument is simply a variation of the position put forward by the proponents of the settlement in *Amchem*, who tried to discount the comparable failure in that case to provide separate representatives for subclasses with conflicting interests, see Brief for Petitioners in *Amchem Products, Inc.* v. *Windsor*, O. T. 1996, No. 96–270, p. 48 (arguing that "achieving a *global* settlement" was "an overriding concern that all plaintiffs [held] in common"); see also *id.*, at 42 (arguing that the requirement of Rule 23(b)(3) that there be predominance of common questions of law or fact had been met by shared interest in "the fairness of the settlement"). The current position is just as unavailing as its predecessor in *Amchem*. There we gave the argument no weight, see 521 U. S., at 625–628, observing that "[t]he benefits asbestos-exposed persons might gain from the establishment of a grand-scale compensation scheme is a matter fit for legislative consideration," but the determination whether "proposed classes are sufficiently cohesive to warrant adjudication" must focus on "questions that preexist any settlement," *id.*, at 622–623.[32] Here, just as in the earlier case, the proponents of the settlement are trying to rewrite Rule 23; each ignores the fact that Rule 23 requires protections under subdivisions (a) and (b) against inequity and potential inequity at the precertification stage, quite independently of the required determination at postcertification fairness review under subdivision (e) that any settlement is fair in an overriding sense. A fairness hearing under subdivision (e) can no more swallow the preceding protective requirements

---

[32] We made this observation in the context of Rule 23(b)(3)'s predominance enquiry, see *Amchem*, 521 U. S., at 622–623, and noted that no " 'limited fund' capable of supporting class treatment under Rule 23(b)(1)(B)" was involved, *id.*, at 623, n. 19.

of Rule 23 in a subdivision (b)(1)(B) action than in one under subdivision (b)(3).[33]

## C

A third contested feature of this settlement certification that departs markedly from the limited fund antecedents is the ultimate provision for a fund smaller than the assets understood by the Court of Appeals to be available for payment of the mandatory class members' claims; most notably, Fibreboard was allowed to retain virtually its entire net worth. Given our treatment of the two preceding deficiencies of the certification, there is of course no need to decide whether this feature of the agreement would alone be fatal to the Global Settlement Agreement. To ignore it entirely, however, would be so misleading that we have decided simply to identify the issue it raises, without purporting to resolve it at this time.

Fibreboard listed its supposed entire net worth as a component of the total (and allegedly inadequate) assets available for claimants, but subsequently retained all but $500,000

---

[33] As a variation of the argument that class members' common interest in securing the insurance settlement overrode any internal conflicts, respondents put forth an alternative rationale for sustaining the certification in this case under Rule 23(b)(1)(B). They assert that "failure by the class to file and maintain a class action to resolve the coverage disputes on a unitary basis—allowing class members instead to prosecute their claims separately—would have put class members to the 'significant risk[s]' that Fibreboard would lose its claimed insurance as a result of the coverage disputes," and that "any separate action by any class member could have *itself* resulted in an adjudication that the insurers owed no coverage to Fibreboard . . . ." Brief for Respondents Continental et al. 25 (quoting Rule 23(b)(1)(B)). Whatever its merits, this rationale for certification is foreclosed by the class conflicts, rehearsed above, that tainted the negotiation of the global settlement, and that at this point cannot be undone. Thus, whether a mandatory class could now be certified without the excluded inventory plaintiffs (whose settlements would appear to be final), or with properly represented subclasses, is an issue we need not address.

of that equity for itself.[34]    On the face of it, the arrangement seems irreconcilable with the justification of necessity in denying any opportunity for withdrawal of class members whose jury trial rights will be compromised, whose damages will be capped, and whose payments will be delayed.    With Fibreboard retaining nearly all its net worth, it hardly appears that such a regime is the best that can be provided for class members.    Given the nature of a limited fund and the need to apply its criteria at the certification stage, it is not enough for a District Court to say that it "need not ensure that a defendant designate a particular source of its assets to satisfy the class' claims; [but only that] the amount recovered by the class [be] fair."    *Ahearn*, 162 F. R. D., at 527.

The District Court in this case seems to have had a further point in mind, however.    One great advantage of class action treatment of mass tort cases is the opportunity to save the enormous transaction costs of piecemeal litigation, an advantage to which the settlement's proponents have referred in this case.[35]    Although the District Court made no specific

[34] We need not decide here how close to insolvency a limited fund defendant must be brought as a condition of class certification.    While there is no inherent conflict between a limited fund class action under Rule 23(b)(1)(B) and the Bankruptcy Code, cf., *e. g., In re Drexel Burnham Lambert Group, Inc.*, 960 F. 2d 285, 292 (CA2 1992), it is worth noting that if limited fund certification is allowed in a situation where a company provides only a *de minimis* contribution to the ultimate settlement fund, the incentives such a resolution would provide to companies facing tort liability to engineer settlements similar to the one negotiated in this case would, in all likelihood, significantly undermine the protections for creditors built into the Bankruptcy Code.    We note further that Congress in the Bankruptcy Reform Act of 1994, Pub. L. 103–394, § 111(a), amended the Bankruptcy Code to enable a debtor in a Chapter 11 reorganization in certain circumstances to establish a trust toward which the debtor may channel future asbestos-related liability, see 11 U. S. C. §§ 524(g), (h).

[35] Some courts certifying limited fund class actions have focused on the advantages such suits have in reducing transaction costs when compared to piecemeal litigation.    See, *e. g., In re Drexel Burnham Lambert Group, Inc., supra,* at 292 (certifying mandatory class in part because "some mem-

finding about the transaction cost saving likely from this class settlement, estimating the amount in the "hundreds of millions," *id.*, at 529, it did conclude that the amount would exceed Fibreboard's net worth as the Court valued it, *ibid.* (Fibreboard's net worth of $235 million "is considerably less than the likely savings in defense costs under the Global Settlement"). If a settlement thus saves transaction costs that would never have gone into a class member's pocket in the absence of settlement, may a credit for some of the savings be recognized in a mandatory class action as an incentive to settlement? It is at least a legitimate question, which we leave for another day.

## V

Our decision rests on a different basis from the ground of JUSTICE BREYER's dissent, just as there was a difference in approach between majority and dissenters in *Amchem.* The nub of our position is that we are bound to follow Rule 23 as we understood it upon its adoption, and that we are not free to alter it except through the process prescribed by Congress in the Rules Enabling Act. Although, as the dissent notes, *post,* at 882, the revised text adopted in 1966 was understood (somewhat cautiously) to authorize the courts to provide for class treatment of mass tort litigation, it was also

---

bers of the putative class might attempt to maintain costly individual actions in the hope and, perhaps, the belief that their claims are more meritorious than the claims of other class members," and thus warranting mandatory class certification "to prevent claimants with such motivations from unfairly diminishing the eventual recovery of other class members"). Although the transaction costs Fibreboard faced prior to settlement were at times significant, see *Ahearn,* 162 F. R. D., at 509; see also App. to Pet. for Cert. 282a (Fibreboard's annual asbestos litigation defense costs ran, at times, as high as twice the total face value of settlements reached), given the exigencies of Fibreboard's contingent insurance asset, this case does not present an instance in which limited fund certification can be justified on the ground that such settlement necessarily provided funds equal to, or greater than, what might have been recovered through individual litigation factoring out transaction costs.

the Court's understanding that the Rule's growing edge for that purpose would be the opt-out class authorized by subdivision (b)(3), not the mandatory class under subdivision (b)(1)(B), see *supra,* at 843–844. While we have not ruled out the possibility under the present Rule of a mandatory class to deal with mass tort litigation on a limited fund rationale, we are not free to dispense with the safeguards that have protected mandatory class members under that theory traditionally.

Apart from its effect on the requirements of subdivision (a) as explained and held binding in *Amchem,* the dissent would move the standards for mandatory actions in the direction of opt-out class requirements by according weight to this "unusual limited fund['s] . . . witching hour," *post,* at 877, in exercising discretion over class certification. It is on this belief (that we should sustain the allowances made by the District Court in consideration of the exigencies of this settlement proceeding) that the dissent addresses each of the criteria for limited fund treatment (demonstrably insufficient fund, intraclass equity, and dedication of the entire fund, see *post,* at 873–883).

As to the calculation of the fund, the dissent believes an independent valuation by the District Court may be dispensed with here in favor of the figure agreed upon by the settling parties. The dissent discounts the conflicts on the part of class counsel who negotiated the Global Settlement Agreement by arguing that the *"relevant"* settlement negotiation, and hence the relevant benchmark for judging the actual value of the insurance amount, was the negotiation between Fibreboard and the insurers that produced the Trilateral Settlement Agreement. See *post,* at 876. This argument, however, minimizes two facts: (1) that Fibreboard and the insurers made this separate, backup agreement only at the insistence of class counsel as a condition for reaching the Global Settlement Agreement; (2) even more important, that "[t]he Insurers were . . . adamant that they would not agree

to pay any more in the context of a backup agreement than in a global agreement," a principle "Fibreboard acceded to" on the day the Global Settlement Agreement was announced "as the price of permitting an agreement to be reached with respect to a global settlement," *Ahearn,* 162 F. R. D., at 516. Under these circumstances the reliability of the Trilateral Settlement Agreement's figure is inadequate as an independent benchmark that might excuse the want of any independent judicial determination that the Global Settlement Agreement's fund was the maximum possible. In any event, the dissent says, it is not crucial whether a $30 claim has to settle for $15 or $20. But it is crucial. Conflict-free counsel, as required by Rule 23(a) and *Amchem,* might have negotiated a $20 figure, and a limited fund rationale for mandatory class treatment of a settlement-only action requires assurance that claimants are receiving the maximum fund, not a potentially significant fraction less.

With respect to the requirement of intraclass equity, the dissent argues that conflicts both within this certified class and between the class as certified and those excluded from it may be mitigated because separate counsel were simply not to be had in the short time that a settlement agreement was possible before the argument (or likely decision) in the coverage case. But this is to say that when the clock is about to strike midnight, a court considering class certification may lower the structural requirements of Rule 23(a) as declared in *Amchem,* and the parallel equity requirements necessary to justify mandatory class treatment on a limited fund theory.

Finally, the dissent would excuse Fibreboard's retention of virtually all its net worth, and the loss to members of the certified class of some 13 percent of the fund putatively available to them, on the ground that the settlement made more money available than any other effort would likely have done. But even if we could be certain that this evaluation were true, this is to reargue *Amchem:* the settlement's fair-

ness under Rule 23(e) does not dispense with the requirements of Rules 23(a) and (b).

We believe that if an allowance for exigency can make a substantial difference in the level of Rule 23 scrutiny, the economic temptations at work on counsel in class actions will guarantee enough exigencies to take the law back before *Amchem* and unsettle the line between mandatory class actions under subdivision (b)(1)(B) and opt-out actions under subdivision (b)(3).

## VI

In sum, the applicability of Rule 23(b)(1)(B) to a fund and plan purporting to liquidate actual and potential tort claims is subject to question, and its purported application in this case was in any event improper. The Advisory Committee did not envision mandatory class actions in cases like this one, and both the Rules Enabling Act and the policy of avoiding serious constitutional issues counsel against leniency in recognizing mandatory limited fund actions in circumstances markedly different from the traditional paradigm. Assuming, *arguendo*, that a mandatory, limited fund rationale could under some circumstances be applied to a settlement class of tort claimants, it would be essential that the fund be shown to be limited independently of the agreement of the parties to the action, and equally essential under Rules 23(a) and (b)(1)(B) that the class include all those with claims unsatisfied at the time of the settlement negotiations, with intraclass conflicts addressed by recognizing independently represented subclasses. In this case, the limit of the fund was determined by treating the settlement agreement as dispositive, an error magnified by the representation of class members by counsel also representing excluded plaintiffs, whose settlements would be funded fully upon settlement of the class action on any terms that could survive final fairness review. Those separate settlements, together with other exclusions from the claimant class, precluded adequate structural protection by subclass treatment, which was not even

afforded to the conflicting elements within the class as certified.

The judgment of the Court of Appeals, accordingly, is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA and JUSTICE KENNEDY join, concurring.

JUSTICE BREYER's dissenting opinion highlights in graphic detail the massive impact of asbestos-related claims on the federal courts. *Post,* at 866–867. Were I devising a system for handling these claims on a clean slate, I would agree entirely with that dissent, which in turn approves the near-heroic efforts of the District Court in this case to make the best of a bad situation. Under the present regime, transactional costs will surely consume more and more of a relatively static amount of money to pay these claims.

But we are not free to devise an ideal system for adjudicating these claims. Unless and until the Federal Rules of Civil Procedure are revised, the Court's opinion correctly states the existing law, and I join it. But the "elephantine mass of asbestos cases," *ante,* at 821, cries out for a legislative solution.

JUSTICE BREYER, with whom JUSTICE STEVENS joins, dissenting.

This case involves a settlement of an estimated 186,000 potential future asbestos claims against a single company, Fibreboard, for approximately $1.535 billion. The District Court, in approving the settlement, made 446 factual findings, on the basis of which it concluded that the settlement was equitable, that the potential claimants had been well represented, and that the distinctions drawn among different categories of claimants were reasonable. *Ahearn* v. *Fibreboard Corp.,* 162 F. R. D. 505 (ED Tex. 1995); App. to Pet. for

Cert. 248a–468a. The Court of Appeals, dividing 2 to 1, held that the settlement was lawful. *In re Asbestos Litigation*, 134 F. 3d 668 (CA5 1998). I would not set aside the Court of Appeals' judgment as the majority does. Accordingly, I dissent.

## I

## A

Four special background circumstances underlie this settlement and help to explain the reasonableness and consequent lawfulness of the relevant District Court determinations. First, as the majority points out, the settlement comprises part of an "elephantine mass of asbestos cases," which "defies customary judicial administration." *Ante*, at 821. An estimated 13-to-21 million workers have been exposed to asbestos. See Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation 6–7 (Mar. 1991) (hereinafter Report). Eight years ago the Judicial Conference spoke of the mass of related cases having "reached critical dimensions," threatening "a disaster of major proportions." *Id.*, at 2. In the Eastern District of Texas, for example, one out of every three civil cases filed in 1990 was an asbestos case. See *id.*, at 8. In the past decade nearly 80,000 new federal asbestos cases have been filed; more than 10,000 new federal asbestos cases were filed last year. See U. S. District Courts Civil Cases Commenced by Nature of Suit, Administrative Office of the Courts Statistics (Dec. 31, 1994–1998) (Table C2–A) (hereinafter AO Statistics).

The Judicial Conference found that asbestos cases on average take almost twice as long as other lawsuits to resolve. See Report 10–11. Judge Parker, the experienced trial judge who approved this settlement, noted in one 3,000-member asbestos class action over which he presided that 448 of the original class members had died while the litigation was pending. *Cimino* v. *Raymark Industries, Inc.*, 751 F. Supp. 649, 651 (ED Tex. 1990). And yet, Judge Parker

went on to state, if the District Court could close "thirty cases a month, it would [still] take six and one-half years to try these cases and [due to new filings] there would be pending over 5,000 untouched cases" at the end of that time. *Id.,* at 652. His subsequent efforts to accelerate final decision or settlement through the use of sample cases produced a highly complex trial (133 trial days, more than 500 witnesses, half a million pages of documents) that eventually closed only about 160 cases because efforts to extrapolate from the sample proved fruitless. See *Cimino* v. *Raymark Industries, Inc.,* 151 F. 3d 297, 335 (CA5 1998). The consequence is not only delay but also attorney's fees and other "transaction costs" that are unusually high, to the point where, of each dollar that asbestos defendants pay, those costs consume an estimated 61 cents, with only 39 cents going to victims. See Report 13.

Second, an individual asbestos case is a tort case, of a kind that courts, not legislatures, ordinarily will resolve. It is the number of these cases, not their nature, that creates the special judicial problem. The judiciary cannot treat the problem as entirely one of legislative failure, as if it were caused, say, by a poorly drafted statute. Thus, when "calls for national legislation" go unanswered, *ante,* at 821, judges can and should search aggressively for ways, within the framework of existing law, to avoid delay and expense so great as to bring about a massive denial of justice.

Third, in that search the district courts may take advantage of experience that appellate courts do not have. Judge Parker, for example, has written of "a disparity of appreciation for the magnitude of the problem," growing out of the difference between the trial courts' "daily involvement with asbestos litigation" and the appellate courts' "limited" exposure to such litigation in infrequent appeals. *Cimino,* 751 F. Supp., at 651.

Fourth, the alternative to class-action settlement is not a fair opportunity for each potential plaintiff to have his or her

own day in court. Unusually high litigation costs, unusually long delays, and limitations upon the total amount of resources available for payment together mean that most potential plaintiffs may not have a realistic alternative. And Federal Rule of Civil Procedure 23 was designed to address situations in which the historical model of individual actions would not, for practical reasons, work. See generally Advisory Committee's Notes on Fed. Rule Civ. Proc. 23, 28 U. S. C. App., p. 696 (discussing, in relation to Rule 23(b)(1)(B), instances in which individual judgments, "while not technically concluding the other members, might do so as a practical matter").

For these reasons, I cannot easily find a legal answer to the problems this case raises by referring, as does the majority, to "our 'deep-rooted historic tradition that everyone should have his own day in court.'" *Ante,* at 846 (citation omitted). Instead, in these circumstances, I believe our Court should allow a district court full authority to exercise every bit of discretionary power that the law provides. See generally *Califano* v. *Yamasaki,* 442 U. S. 682, 703 (1979) ("[M]ost issues arising under Rule 23 . . . [are] committed in the first instance to the discretion of the district court"); *Reiter* v. *Sonotone Corp.,* 442 U. S. 330, 345 (1979) (district courts have "broad power and discretion . . . with respect to matters involving the certification" of class actions). And, in doing so, the Court should prove extremely reluctant to overturn a fact-specific or circumstance-specific exercise of that discretion, where a court of appeals has found it lawful. Cf. *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474, 490–491 (1951) (Supreme Court will rarely overturn appellate court review of agency factfinding). This cautionary principle of review leads me to an ultimate conclusion different from that of the majority.

## B

The case before us involves a class of individuals (and their families) exposed to asbestos manufactured by Fibreboard

who, for the most part, had not yet sued or settled with Fibreboard as of August 1993. The negotiating parties estimated that Fibreboard faced approximately 186,000 of these future claims. See App. to Pet. for Cert. 321a; cf. AO Statistics, Table C2–A (total number of *all* civil cases filed in federal district courts in 1998 was 252,994). Although the District Court was unable to give a precise figure, see App. to Pet. for Cert. 356a–357a, there is no doubt that a realistic assessment of the value of these claims far exceeds Fibreboard's total net worth.

But, as of 1993, one potentially short-lived additional asset promised potential claimants a greater recovery. That asset consisted of two insurance policies, one issued by Continental Casualty, the other by Pacific Indemnity. If the policies were valid (*i. e.*, if they covered most of the relevant claims), they were worth several billion dollars; but if they were invalid, this asset was worth nothing. At that time, a separate case brought by Fibreboard against the insurance companies in California state court seemed likely to resolve the value of the policies in the near future. That separate litigation had a settlement value for the insurance companies. At the time the parties were negotiating, prior to the California court's decision, the insurance policies were worth, as the majority puts it, the value of "unlimited policy coverage" (*i. e.*, perhaps the insurance companies' entire net worth) "discounted by the risk that Fibreboard would ultimately lose the coverage dispute litigation." *Ante*, at 851.

The insurance companies offered to settle with both Fibreboard and those persons with claims against Fibreboard (who might have tried to sue the insurance companies directly). The settlement negotiations came to a head in August 1993, just as a California state appeals court was poised to decide the validity of the insurance policies. This fact meant speed was important, for the California court could well decide that the policies were worth nothing. It also meant that it was important to certify a non-opt-out class of Fibreboard plain-

tiffs. If the class that entered into the settlement were an opt-out class, then members of that class could wait to see what the California court did. If the California court found the policies valid (hence worth many billions of dollars), they would opt out of the class and sue for everything they could get; if the California court found the policies invalid (and worth nothing), they would stick with the settlement. The insurance companies would gain little from that kind of settlement, and they would not agree to it. See *In re Asbestos Litigation*, 90 F. 3d 963, 970 (CA5 1996).

After eight days of hearings, the District Court found that the insurance policies plus Fibreboard's net worth amounted to a "limited fund," valued at $1.77 billion (the amount the insurance companies were willing to contribute to the settlement plus Fibreboard's value). See App. to Pet. for Cert. 492a. The court entered detailed factual findings. See generally 162 F. R. D., at 518–519. It certified a "non-opt-out" class. And the court approved the parties' Global Settlement Agreement. The Global Settlement Agreement allows those exposed to asbestos (and their families) to assert their Fibreboard claims against a fund that it creates. It does not limit recoveries for particular types of claims, but allows for individual determinations of damages based on all historically relevant individual factors and circumstances. See 90 F. 3d, at 976. It contains spendthrift provisions designed to limit the total payouts for any particular year, and a requirement that the claimants with the most serious injuries be paid first in any year in which there is a shortfall. It also permits an individual who wishes to retain his right to bring an ordinary action in court to opt out of the arrangement (albeit after mediation and nonbinding arbitration), but sets a ceiling of $500,000 upon the recovery obtained by any person who does so. See generally 162 F. R. D., at 518–519.

The question here is whether the court's certification of the class under Rule 23(b)(1)(B) violates the law. The majority seems to limit its holding (though not its discussion)

to that question, and so I limit the focus of my dissent to the Rule 23(b)(1)(B) issues as well.

## II

The District Court certified a class consisting primarily of individuals (and their families) who had been exposed to Fibreboard's asbestos but who had not yet made claims. See *ante*, at 825–827, and n. 5. It did so under the authority of Federal Rule of Civil Procedure 23(b)(1)(B), which, by analogy to pre-Rules "limited fund" cases, permits certification of a non-opt-out class where

> "the prosecution of separate actions by or against individual members of the class would create a risk of . . . adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests."

The majority thinks this class could not be certified under Rule 23(b)(1)(B). I, on the contrary, think it could.

The case falls within the Rule's language as long as there was a significant "risk" that the total assets available to satisfy the claims of the class members would fall well below the likely total value of those claims, for in such circumstances the money would go to those claimants who brought their actions first, thereby " 'substantially impair[ing]' " the " 'ability' " of later claimants " 'to protect their interests.' " And the District Court found there was indeed such a " 'risk.' " 162 F. R. D., at 526.

Conceptually speaking, that "risk" was no different from the risk inherent in a classic pre-Rules "limited fund" case. Suppose a broker agrees to invest the funds of 10 individuals who each give the broker $100. The broker misuses the money, and the customers sue. (1) Suppose their claims total $1,000, but the broker's total assets amount to $100.

(2) Suppose the same broker has no assets left, but he does have an insurance policy worth $100. (3) Suppose the broker has both $100 in assets and a $100 insurance policy.

The first two cases are classic limited fund cases. See *ante*, at 834–836 (citing, *e. g., Dickinson* v. *Burnham*, 197 F. 2d 973 (CA2 1952), cert. denied, 344 U. S. 875 (1952), an investors' suit for the return of misused funds); *ante*, at 837 (citing, *e. g., Morrison* v. *Warren*, 174 Misc. 233, 234, 20 N. Y. S. 2d 26, 27 (Sup. Ct. N. Y. Cty. 1940), a suit to distribute insurance proceeds to third party beneficiaries). The third case simply combines the first two, and that third case is the case before us.

Of course the value of the insurance policies in our case is not as precise as the $100 in my example, nor was it certain at the time of settlement. But that uncertainty makes no difference. It was certain that the insurance policies' value was limited. And that limitation was created by the likelihood of an independent judicial determination of the meaning of words in the policy, in respect to which the merits or value of the underlying tort claims against Fibreboard were beside the point.

Nor does it matter that the value of the insurance policies in our case might have fluctuated over time. Long before the Federal Rules of Civil Procedure, courts permitted actions by one group of insurance policyholders to bind all policyholders, even where the group proceeded against an insurance-company-administered fund that fluctuated over time. See *Hartford Life Ins. Co.* v. *IBS*, 237 U. S. 662, 672 (1915) (life insurance fund which, like the fund before us, was administered through court-ordered rules that bound all policyholders).

Neither does it matter that the insurance policies *might* be worth much more money *if* the California court decided the coverage dispute in Fibreboard's favor. A trust worth, say, $1 million (faced with $2 million in claims) is a limited fund, despite the possibility that a company whose stock it

holds *might* strike oil and send the value of the trust sky-rocketing. Limitation is a matter of present value, which takes appropriate account of such future possibilities.

I need not pursue the conceptual matter further, however, for the majority apparently concedes the conceptual point that a fund's limit may equal its "value discounted by risk." *Ante*, at 851. But the majority sets forth three additional conditions that it says are "sufficient . . . to justify binding absent members of a class under Rule 23(b)(1)(B), from which no one has the right to secede." *Ante*, at 838. The three are:

> *Condition One:* That "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims." *Ibid.*; Part IV–A, *ante*.
>
> *Condition Two:* That "the claimants identified by a common theory of recovery were treated equitably among themselves." *Ante*, at 839; Part IV–B, *ante*.
>
> *Condition Three:* That "the whole of the inadequate fund was to be devoted to the overwhelming claims." *Ante*, at 839; Part IV–C, *ante*.

I shall discuss each condition in turn.

## A

In my view, the first condition is substantially satisfied. No one doubts that the "totals of the aggregated" claims well exceed the value of the assets in the "fund available for satisfying them," at least if the fund totaled about what the District Court said it did, namely, $1.77 billion at most. The District Court said that the limited fund equaled in value "the sum of the value of Fibreboard plus the value of its insurance coverage," or $235 million plus $1.535 billion. App. to Pet. for Cert. 492a. The Court of Appeals upheld

the finding. 90 F. 3d, at 982. And the finding is adequately supported.

The District Court found that the insurance policies were not worth substantially more than $1.535 billion in part because there was a "significant risk" that the insurance policies would soon turn out to be worth nothing at all. 162 F. R. D., at 526. The court wrote that "Fibreboard might lose" its coverage, *i. e.*, that it might lose "on one or more issues in the [California] Coverage Case, or that Fibreboard might lose its insurance coverage as a result of its assignment settlement program." *Ibid.*

Two California insurance law experts, a Yale professor and a former state court of appeals judge, testified that there was a good chance that Fibreboard would lose all or a significant part of its insurance coverage once the California appellate courts decided the matter. 90 F. 3d, at 974. And that conclusion is not surprising. The Continental policy (for which Fibreboard had paid $10,000 per year) carried limits of $500,000 "per-person" and $1 million "per-occurrence," had been in effect only between May 1957 and March 1959, and arguably denied Fibreboard the right to settle tort cases as it had been doing. See App. to Pet. for Cert. 267a. The Pacific policy was said (no one could find a copy) to carry a $500,000 per-claim limit, and had been in effect only for one year, from 1956 to 1957. See *ibid.* To win significantly in respect to either of the two policies, Fibreboard had to show that the policies fully covered a person exposed to asbestos long before the policy year (say, in 1948) even if the disease did not appear until much later (say, in 2002). It also had to explain away the $1 million per occurrence limit in the Continental policy, despite policy language defining "one occurrence" as " '[a]ll . . . exposure to substantially the same general conditions existing at or emanating from each premises location.' " Brief for Respondents Continental Casualty et al. 5. And Fibreboard had to show that its tort-suit settlement practice was consistent with the policy.

The settlement value of previous cases also indicated that the insurance policies were of limited value. Fibreboard's "no-cash" settlements (which required a settling plaintiff to obtain recovery from the insurance companies) were twice as high on average as were its comparable 40% cash settlements. App. to Pet. for Cert. 231a. That difference, suggesting a 50% discount for 40% cash, in turn suggests that settling parties estimated the odds of recovering on the insurance policies as worse than 2 to 1 against.

The District Court arrived at the present value of the policies ($1.535 billion) by looking to a different settlement, the settlement arrived at in the insurance coverage case itself as a result of bargaining between Fibreboard and the insurance companies. See *id.*, at 492a. That settlement, embodied in the Trilateral Agreement, created a backup fund by taking from the insurance companies $1.535 billion (plus other money used to satisfy claims not here at issue) and simply setting it aside to use for the payment of claims brought against Fibreboard in the ordinary course by members of this class (in the event that the federal courts ultimately failed to approve the Global Settlement Agreement).

The Fifth Circuit approved this method of determining the value of the insurance policies. See 90 F. 3d, at 982 (discussing value of Trilateral Agreement plus value of Fibreboard). And the majority itself sees nothing wrong with that method in principle. The majority concedes that one

> "may take a settlement amount as good evidence of the maximum available if one can assume that parties of equal knowledge and negotiating skill agreed upon the figure through arms-length bargaining, unhindered by any considerations tugging against the interests of the parties ostensibly represented in the negotiation." *Ante*, at 852.

The majority rejects the District Court's valuation for a different reason. It says that the settlement negotiation

that led to the valuation was not necessarily a fair one. The majority says it cannot make the necessary "arms-length bargaining" assumption because *"[c]lass counsel"* had a "great incentive to reach any agreement" in light of the fact that "some of the same lawyers . . . had also negotiated the separate settlement of 45,000" pending cases, which was partially contingent upon a global settlement or other favorable resolution of the insurance dispute. *Ibid.* (emphasis added).

The District Court and Court of Appeals, however, did accept the relevant "arms-length" assumption, with good reason. The *relevant* bargaining (*i. e.,* the bargaining that led to the Trilateral Agreement that set the policies' value) was not between the *plaintiffs' class counsel* and the insurance companies; it was between *Fibreboard* and the insurance companies. And there is no reason to believe that *that* bargaining, engaged in to settle the California coverage dispute, was not "arms length." That bargaining did not lead to a settlement that would release Fibreboard from potential tort liability. Rather, it led to a potential backup settlement that did not release Fibreboard from anything. It created a fund of insurance money, which, once exhausted, would have left Fibreboard totally exposed to tort claims. Consequently, Fibreboard had every incentive to squeeze as much money as possible out of the insurance companies, thereby creating as large a fund as possible in order to diminish the likelihood that it would eventually have to rely upon its own net worth to satisfy future asbestos plaintiffs.

Nor are petitioners correct when they argue that the insurance companies' participation in setting the value of the insurance policies created a fund that is limited "only in the sense that . . . every settlement is limited." Brief for Petitioners 28. As the District Court found, the fund was limited by the value of the insurance policies (along with Fibreboard's own limited net worth), and that limitation arose out of the independent likelihood that the California courts

would find the policies valueless. App. to Pet. for Cert. 492a. That is why the District Court said that certification in this case does not determine whether

> "mandatory class certification is appropriate in the typical case where a class action is settled with a defendant's own funds, or with insurance funds that are not the subject of genuine and vigorous dispute." 162 F. R. D., at 527.

The court added that, in the ordinary case: "If the settlement failed[,] . . . the defendant would retain the settlement funds (or the insurance coverage), and there might not be the 'impair[ment]' to class members' 'ability to protect their interests' required for mandatory class certification." *Ibid.* In this case, however, if settlement failed, coverage "[might] well disappear . . . with the result that Class members could not then secure their due through litigation." *Ibid.*

I recognize that one could reasonably argue about whether the total value of the insurance policies (plus the value of Fibreboard) is $1.535 billion, $1.77 billion, $2.2 billion, or some other roughly similar number. But that kind of argument, in this case, is like arguing about whether a trust fund, facing $30,000 in claims, is worth $15,000 or $20,000 (*e. g.,* do we count Aunt Agatha's share as part of the fund?), or whether a ship, subject to claims that, by any count, exceed its value, is worth a little more or a little less (*e. g.,* does the coal in the hold count as fuel, which is part of the ship's value, or as cargo, which is not?). A perfect valuation, requiring lengthy study by independent experts, is not feasible in the context of such an unusual limited fund, one that comes accompanied with its own witching hour. Within weeks after the parties' settlement agreement, the insurance policies might well have disappeared, leaving most potential plaintiffs with little more than empty claims. The ship was about to sink, the trust fund to evaporate; time was important. Under these circumstances, I would accept the valuation

findings made by the District Court and affirmed by the Court of Appeals as legally sufficient. See *supra,* at 868.

## B

I similarly believe that the second condition is satisfied. The "claimants . . . were treated equitably among themselves." *Ante,* at 839. The District Court found equitable treatment, and the Court of Appeals affirmed. But a majority of this Court now finds significant inequities arising out of class counsel's "egregious" conflict of interest, the settlement's substantive terms, and the District Court's failure to create subclasses. See *ante,* at 854–859. But nothing I can find in the Court's opinion, nor in the objectors' briefs, convinces me that the District Court's findings on these matters were clearly erroneous, or that the Court of Appeals went seriously astray in affirming them.

The District Court made 76 separate findings of fact, for example, in respect to potential conflicts of interest. App. to Pet. for Cert. 392a–430a. Of course, class counsel consisted of individual attorneys who represented other asbestos claimants, including many other Fibreboard claimants outside the certified class. Since Fibreboard had been settling cases contingent upon resolution of the insurance dispute for several years, any attorney who had been involved in previous litigation against Fibreboard was likely to suffer from a similar "conflict." So whom should the District Court have appointed to negotiate a settlement that had to be reached soon, if ever? Should it have appointed attorneys unfamiliar with Fibreboard and the history of its asbestos litigation? Where was the District Court to find those competent, knowledgeable, conflict-free attorneys? The District Court said they did not exist. Finding of Fact ¶ 372 says there is "no credible evidence of the existence of other 'conflict-free' counsel who were qualified to negotiate" a settlement within the necessary time. *Id.,* at 428a. Finding of Fact ¶ 317 adds that the District Court viewed it as

"crucial . . . to appoint asbestos attorneys who were experienced, knowledgeable, skilled and credible in view of the extremely short window of opportunity to negotiate a global settlement, and the very high risk to future claimants presented by the Coverage Case appeal." *Id.*, at 401a. Where is the clear error?

The majority emphasizes the fact that, by settling the claims of a class that consisted, for the most part, of persons who had not yet asserted claims against Fibreboard, counsel assured the availability of funds to pay other clients who had already asserted those claims. *Ante*, at 852–853. The decision to split the latter "inventory" claims from the former "class" claims, however, reflected the suggestion, not of class counsel, but of a judge, Circuit Judge Patrick Higginbotham, who had become involved in efforts to produce a timely settlement. Judge Higginbotham thought that negotiations had broken down because the combined class was "too complex." App. to Pet. for Cert. 316a–317a; see also *id.*, at 397a. He thought "inventory" claim settlements could be used as benchmarks to determine future class claim values, *id.*, at 316a–317a, and that is just what happened. Although the majority is concerned that "inventory" plaintiffs "appeared to have obtained better terms than the class members," *ante*, at 855, Finding of Fact ¶ 329 says that class counsel

> "used the higher-than-average [inventory plaintiff settlement values] . . . to achieve a global settlement for future claimants at similarly high values, effectively arguing they could not possibly accept less for a class of future claimants than they had just negotiated for their present clients." App. to Pet. for Cert. 407a.

In addition, more than 150 findings of fact, made after an 8-day hearing, support the District Court's finding that overall the settlement is "fair, adequate, and reasonable." See *id.*, at 500a–501a. And, of course, Finding of Fact ¶ 318 says that appointing other attorneys—*i. e.*, those who had no in-

ventory clients—would have "'jeopardiz[ed] any effort at serious negotiations'" and "resulted in a less favorable settlement" for the class, or perhaps no settlement followed by no insurance policy either. *Id.*, at 402a.

The Fifth Circuit found that "[t]he record amply supports" these District Court findings. 90 F. 3d, at 978. Does the majority mean to set them aside? If not, does it mean to set forth a rigid principle of law, such as the principle that asbestos lawyers with clients outside a class, who will potentially benefit from a class settlement, can *never* represent a class in settlement negotiations? And does that principle apply no matter how unusual the circumstances, or no matter how necessary that representation might be? Why should there be such a rule of law? If there is not an absolute rule, however, I do not see how this Court can hold that the case before us is *not* that unusual situation.

Consider next the claim that "equity" required more subclasses. *Ante,* at 855–857. To determine the "right" number of subclasses, a district court must weigh the advantages and disadvantages of bringing more lawyers into the case. The majority concedes as much when it says "at some point there must be an end to reclassification with separate counsel." *Ante,* at 857. The District Court said that if there had "been as many separate attorneys" as the objectors wanted, "there is a significant possibility that a global settlement would not have been reached before the Coverage Case was resolved by the California Court of Appeal." App. to Pet. for Cert. 428a. Finding of Fact ¶ 346 lists the shared common interests among subclasses that argue for single representation, including "avoiding the potentially disastrous results of a loss . . . in the Coverage Case," "maximizing the total settlement contribution," "reducing transaction costs and delays," "minimizing . . . attorney's fees," and "adopting" equitable claims payment "procedures." *Id.*, at 415a. Surely the District Court was within its discretion to conclude that "the point" to which the majority alludes was reached in this case.

I need not go into further detail here. Findings of Fact ¶¶ 347–354 explain why the alleged conflict between pre- and post-1959 claimants is not significant. *Id.,* at 415a–418a (noting that "the decision as to how to divide the settlement among class members" did not take place until after the Trilateral Agreement was agreed to, at which point money was available equally to both pre- and post-1959 claimants). Findings of Fact ¶¶ 355–363 explain why the alleged conflict between claimants with, and those without, current illnesses is not significant. *Id.,* at 419a–422a (explaining why "the interest of the two subgroups at issue here coincide to a far greater extent than they diverge"). The Fifth Circuit found that the District Court "did not abuse its discretion in finding that the class was adequately represented and that subclasses were not required." 90 F. 3d, at 982. This Court should not overturn these highly circumstance-specific judgments.

### C

The majority's third condition raises a more difficult question. It says that the *"whole* of the inadequate fund" must be "devoted to the overwhelming claims." *Ante,* at 839 (emphasis added). Fibreboard's own assets, in theory, were available to pay tort claims, yet they were not included in the global settlement fund. Is that fact fatal?

I find the answer to this question in the majority's own explanation. It says that the third condition helps to guarantee that those who held the

> "inadequate assets had no opportunity to benefit [themselves] or claimants of lower priority by holding back on the amount distributed to the class. The limited fund cases thus ensured that the class as a whole was given the best deal; they did not give a defendant a better deal than *seriatim* litigation would have produced." *Ibid.*

That explanation suggests to me that Rule 23(b)(1)(B) permits a slight relaxation of this absolute requirement, where its basic purpose is met, *i. e.*, where there is no doubt that "the class as a whole was given the best deal," and where there is good reason for allowing the third condition's *substantial*, rather than its *literal*, satisfaction.

Rule 23 itself does not require modern courts to trace every contour of ancient case law with literal exactness. Benjamin Kaplan, Reporter to the Advisory Committee on Civil Rules that drafted the 1966 revisions, upon whom the majority properly relies for explanation, see, *e. g., ante,* at 833, 834, 842–843, wrote of Rule 23:

> "The reform of Rule 23 was intended to shake the law of class actions free of abstract categories . . . and to rebuild the law on functional lines responsive to those recurrent life patterns which call for mass litigation through representative parties. . . . And whereas the old Rule had paid virtually no attention to the practical administration of class actions, the revised Rule dwelt long on this matter—not, to be sure, by prescribing detailed procedures, but by confirming the courts' broad powers and inviting judicial initiative." A Prefatory Note, 10 B. C. Ind. & Com. L. Rev. 497 (1969).

The majority itself recognizes the possibility of providing incentives to enter into settlements that reduce costs by granting a "credit" for cost savings by relaxing the whole-of-the-assets requirement, at least where most of the savings would go to the claimants. *Ante,* at 861.

There is no doubt in this case that the settlement made far more money available to satisfy asbestos claims than was likely to occur in its absence. And the District Court found that administering the fund would involve transaction costs of only 15%. App. to Pet. for Cert. 362a. A comparison of that 15% figure with the 61% transaction costs figure applicable to asbestos cases in general suggests hundreds of mil-

lions of dollars in savings—an amount greater than Fibreboard's net worth. And, of course, not only is it better for the injured plaintiffs, it is far better for Fibreboard, its employees, its creditors, and the communities where it is located for Fibreboard to remain a working enterprise, rather than slowly forcing it into bankruptcy while most of its money is spent on asbestos lawyers and expert witnesses. I would consequently find substantial compliance with the majority's third condition.

Because I believe that all three of the majority's conditions are satisfied, and because I see no fatal conceptual difficulty, I would uphold the determination, made by the District Court and affirmed by the Court of Appeals, that the insurance policies (along with Fibreboard's net value) amount to a classic limited fund within the scope of Rule 23(b)(1)(B).

### III

Petitioners raise additional issues, which the majority does not reach. I believe that respondents would likely prevail were the Court to reach those issues. That is why I dissent. But, as the Court does not reach those issues, I need not decide the questions definitively.

In some instances, my belief that respondents would likely prevail reflects my reluctance to second-guess a court of appeals that has affirmed a district court's fact- and circumstance-specific findings. See *supra,* at 868; cf. *Amchem Products, Inc.* v. *Windsor,* 521 U. S. 591, 629–630 (1997) (BREYER, J., concurring in part and dissenting in part). That reluctance applies to those of petitioners' further claims that, in effect, attack the District Court's conclusions related to: (1) the finding under Rule 23(a)(2) that there are "questions of law and fact common to the class," see App. to Pet. for Cert. 480a; see generally *Amchem, supra,* at 634–636 (BREYER, J., concurring in part and dissenting in part); (2) the finding under Rule 23(a)(3) that claims of the representative parties are "typical" of the claims of the class, see App.

to Pet. for Cert. 480a–481a; (3) the adequacy of "notice" to class members pursuant to Rule 23(e) and the Due Process Clause, see *id.*, at 511a; see generally *Amchem, supra,* at 640–641 (BREYER, J., concurring in part and dissenting in part); and (4) the standing-related requirement that each class member have a good-faith basis under state law for claiming damages for some form of injury-in-fact (even if only for fear of cancer or medical monitoring), see App. to Pet. for Cert. 252a; cf., *e. g., Coover* v. *Painless Parker, Dentist,* 105 Cal. App. 110, 286 P. 1048 (1930).

In other instances, my belief reflects my conclusion that class certification here rests upon the presence of what is close to a *traditional* limited fund. And I doubt that petitioners' additional arguments that certification violates, for example, the Rules Enabling Act, the Bankruptcy Act, the Seventh Amendment, and the Due Process Clause are aimed at, or would prevail against, a traditional limited fund (*e. g.,* "trust assets, a bank account, insurance proceeds, company assets in a liquidation sale, proceeds of a ship sale in a maritime accident suit," *ante,* at 834 (internal quotation marks and citations omitted)). Cf. *In re Asbestos Litigation,* 90 F. 3d, at 986 (noting that *Phillips Petroleum Co.* v. *Shutts,* 472 U. S. 797 (1985), involved a class certified under the equivalent of Rule 23(b)(3), not a limited fund case under Rule 23(b)(1)(B)). Regardless, I need not decide these latter issues definitively now, and I leave them for another day. With that caveat, I respectfully dissent.