# In the
# United States Court of Appeals
### For the Seventh Circuit

Nos. 12-1157, 12-1158, 12-1186,
12-1730, 12-1753 & 12-1764

SAFECO INSURANCE COMPANY OF AMERICA, *et al.*,

*Plaintiffs-Appellants,*

*and*

LIBERTY MUTUAL INSURANCE CO., *et al.*,

*Counterclaimants-Appellants,*

*and*

ACE INA HOLDINGS, INC., *et al.*,

*Intervening Plaintiffs-Appellees/*
*Defendants-Appellees,*

*v.*

AMERICAN INTERNATIONAL GROUP, INC., *et al.*,

*Defendants-Appellees/Plaintiffs-Appellees/*
*Counterdefendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 07 C 2898 & 09 C 2026—**Robert W. Gettleman**, *Judge.*

ARGUED NOVEMBER 29, 2012—DECIDED MARCH 25, 2013

Before EASTERBROOK, *Chief Judge*, and POSNER and MANION, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.   About 45 days after these appeals had been argued, the appellants asked us to dismiss them, see Fed. R. App. P. 42(b), informing the court that the dispute had been settled. All but one of the appellees (ACE INA Holdings) joined a stipulation of dismissal; ACE did not join it, but neither does it oppose dismissal. Because the litigation is a class action, however, we were concerned that the settlement might have adverse effects on other members of the class. So we asked for additional memoranda. These have been filed, and in the two months that have elapsed since the notice no member of the class has expressed opposition. Having concluded that the settlement does not jeopardize the interests of the unrepresented class members, we dismiss the appeals.

The first sentence of Rule 42(b) provides that, if all parties agree to an appeal's dismissal, then the clerk of court may close the proceeding without judicial action. ACE did not join the stipulation, so the second sentence of Rule 42(b) applies: "An appeal may be dismissed on the appellant's motion on terms agreed to by the parties or fixed by the court." This sentence uses "may" rather than "must" so that the judges can protect the rights of anyone who did not consent to the dismissal. Although

the members of the class are not technically parties, they have legally enforceable interests. See *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

Companies underwriting workers' compensation insurance participate in a reinsurance pool administered by the National Workers Compensation Reinsurance Association (the Association). Insurers share in the pool's profit or loss according to the volume of business they underwrite. When the pool is profitable, it is beneficial to have a larger book of business; when the pool loses money, a smaller book means that the underwriter needs to contribute less toward the losses. The class in this suit contends that American International Group (AIG) underreported the size of its business in losing years, causing the pool's other members to bear a disproportionate share of the losses. The class asked for about $3.1 billion.

Some of the insurers had other business dealings. Liberty Mutual and its affiliates, including Safeco, have independent claims against AIG. For its part, AIG advanced claims against Liberty Mutual (as we call the entire group). When Liberty Mutual caused Safeco to commence this class action as the representative plaintiff, these other claims complicated the litigation. Once it became evident that Liberty Mutual had unacceptable conflicts, ACE INA Holdings intervened, with several other insurers, to take over as the class's representatives. Still, Liberty Mutual sought to use the class suit as a club to induce AIG to pay more on its separate claims against AIG, while AIG sought to minimize the sum

of what it paid the class plus what it owed Liberty Mutual separately.

ACE (and the other new representatives, which we ignore from here on) eventually settled the class claims against AIG for $450 million. The settlement includes releases of all claims that pool members held against AIG in all lines of business (not just reinsurance of workers' compensation policies), plus releases of AIG's claims against the class's members. Liberty Mutual protested; it contended that its 22% share of the settlement (some $99 million) is too small, given the value of its independent claims against AIG. The settlement provides that any class member can opt out, and ACE anticipated that Liberty Mutual would do so. The settlement agreement provides that, if Liberty Mutual were to opt out, AIG's payment would be reduced to $351 million.

Liberty Mutual elected to stay in the class. So did all but one other insurer. The district judge approved the settlement after a hearing under Fed. R. Civ. P. 23(e). 2012 U.S. Dist. LEXIS 25265 (N.D. Ill. Feb. 28, 2012). Liberty Mutual then appealed, arguing in this court that its share of the settlement does not compensate it adequately for the value of its stand-alone claims against AIG. It also contended that the conflicts of interest within the reinsurance pool meant that the case never should have been certified as a class. (This argument appears in Safeco's brief rather than Liberty Mutual's, but as they are under joint control the main effect of filing separate briefs is to get extra words. None of the other parties contends that Safeco should be viewed

as independent of its parent; after all, this is why Safeco was not a satisfactory class representative.) Appellants made some other arguments, which need not be described. None of the insurers outside the Liberty Mutual group complained about the class certification or the settlement, and the Association, on behalf of the entire pool, supported the district court's decision.

After argument, Liberty Mutual settled with AIG. The terms of the settlement do not matter to the other members of the class, who still split $351 million among them. ACE and the other representatives are content. Neither the Association (which manages the pool) nor any member of the class has protested. It is accordingly hard to see how a live controversy remains, and courts should not issue opinions resolving litigation that the parties no longer want to pursue. Since no one now wants us to adjudicate this dispute—or even suggests that there is a "dispute" left to adjudicate—dismissing the appeals is in order. Cf. *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994).

We have considered, in the spirit of Rule 23(e), whether this settlement has any potential to injure non-participants. Yet all of the pool's members outside the Liberty Mutual group still get exactly what they accepted before—and the district court found that resolution fair. Liberty Mutual's appeal principally concerns the way the district court's order affects its own claims against AIG. That's something Liberty Mutual had every right to resolve independently by opting out. A settlement between Liberty Mutual and AIG while

the appeal was pending works as a belated opt-out, which has no greater potential to injure the pool's other members than an opt-out before the district court acted would have done. If, under the settlement, opt-out by Liberty Mutual meant undoing the pact and continuing the litigation, then a *de facto* opt-out on appeal might justify a remand. But the possibility of Liberty Mutual opting out and reaching a side deal with AIG was provided for in the settlement itself. That this possibility now has been realized does not call into question the settlement's fairness to the pool's other members.

Could Liberty Mutual's appeal itself have injured other members of the class—perhaps by leading them to think that they needn't file their own appeals? That is very unlikely, for three reasons.

First, what issues would other class members have raised on appeal? None had complained about the settlement, so there was no adverse decision to appeal *from*. Second, why would Liberty Mutual's appeal have dissuaded another insurer from appealing? Any other firm could see that Liberty Mutual was appealing to defend its separate interests; none would have relied on Liberty Mutual. The established conflict between Liberty Mutual and the rest of the class is why ACE intervened to take over as the representative plaintiff. Other members of the class would have seen Liberty Mutual as a threat to their interests, not as a champion they could rely on for protection. Recall that Liberty Mutual asked us to abrogate the class certification, a step that would have eliminated the other insurers' recoveries.

Third, Liberty Mutual waited until the end of the window for appeal. The judgment was entered on February 28, 2012, and the appeals were filed on March 27. No other insurer could have been safe in waiting to see whether Liberty Mutual would appeal; a pool member that wanted appellate review would have acted on its own before March 27. Liberty Mutual would not have violated any other insurer's rights by settling with AIG on March 26 and never filing an appeal; filing an appeal at the end of the available time and settling later has no greater potential to injure other members of the class.

Although we appreciate that conflicts of interest between representative plaintiffs and class members can lead the representatives to sell out for too little, no one has accused ACE of yielding to that temptation. All members of the class are large and sophisticated businesses, many with millions on the line and legal staffs to protect their interests. Even the smaller insurers receive more than $100,000 from the settlement, and if the representatives had been able to negotiate for the $3 billion the class initially sought, the average return per insurer would have exceeded $2 million (and about $750,000 apiece for the smaller insurers). The pool is a multi-billion-dollar business; its manager, which looks out for the aggregate of all members' interests, supports both the original settlement and the dismissal of Liberty Mutual's appeal. The *Manual for Complex Litigation* §21.61 (4th ed. 2004), provides a list of events that may tip off the judiciary to

a problem; none of the things to watch for has occurred in this suit.

Because there is no prospect of injury to any other class member, we need not discuss at length this statement in the committee note to the 2003 amendment to Rule 23(e): "Once an objector appeals, control of the proceeding lies in the court of appeals. The court of appeals may undertake review and approval of a settlement with the objector, perhaps as part of appeal settlement procedures, or may remand to the district court to take advantage of the district court's familiarity with the action and settlement." The committee note does not discuss any particular language in Rule 23, which like the other civil rules deals with proceedings in district courts rather than courts of appeals. All the committee's statement does is recognize that the court of appeals will decide what to do. For the reasons we have given, we do not think any further proceedings necessary.

If despite appearances this settlement makes other class members worse off or disappoints their reasonable expectations, a class member could file a motion in the district court under Fed. R. Civ. P. 60(b)(3) (misconduct by an opposing party) or 60(b)(6) ("any other reason that justifies relief"). If such a motion were to be filed, a concrete controversy would call for judicial resolution. At the moment, however, none of the parties wants to fight, and none of the class members has expressed dissatisfaction. Any further proceedings would be gratuitous. The appeals are dismissed.

POSNER, *Circuit Judge*, dissenting. Dismissal of the appeal in this class action suit is premature. It is based on speculation rather than on evidence, is insensitive to the risks of class action sell-out, and makes critical errors.

We don't know the terms of the settlement on which dismissal is predicated, so we don't know whether the settlement sells out the interests of the class. But it may. In discounting that possibility the majority opinion makes two critical errors. The first is to say that "any other firm [that is, any other class member] could see that Liberty Mutual was appealing to defend its separate interests; none would have relied on Liberty Mutual." Yet two subsidiaries of Liberty had submitted a separate appellate brief, arguing that the conflict between class members that were sued by AIG and those that weren't required division of the class into subclasses, each with separate counsel. That was an argument on behalf of class members who were unrelated to the Liberty group.

The second mistake in the majority opinion is related: it is the statement that "all members of the class are large and sophisticated businesses, many with millions on the line and legal staffs to protect their interests. Even the smaller insurers receive more than $100,000 from the settlement, and if the representatives had been able to negotiate for the $3 billion the class initially sought, the average return per insurer would have exceeded $2 million (and about $750,000 apiece for the smaller insurers)." There are 1363 class members, and 55 percent of the settlement goes to just four of them, leaving

$202 million to be divided among the other 1359. That is an average of only $148,638.87 apiece. It implies that many of the claims probably are much smaller. There is no basis for the assertion that all the insurers will receive at least $100,000 from the settlement, and no basis for estimating the maximum likely settlement.

Some class members had been countersued by AIG, but others had not been. The brief filed by Liberty's subsidiaries argued that those who had not been had been undercompensated by the settlement because there was no reason to offset their claims by AIG counterclaims. Those class members might have relied on the brief of Liberty's subsidiaries to advance this argument, foregoing the expense of filing their own appeals from the class action and their own appeal briefs because their own claims may not have been large enough to justify the expense—and anyway why incur it when they had a champion, namely Liberty? And remember that, as far as we know, the class members have not been informed of the settlement of the appeals or of the motion to dismiss them. And so the appellate settlement may be a device by which AIG paid Liberty to desert the class on whose behalf (as well as its own) it purported to be appealing.

Rule 42(b) of the appellate rules does not *require* dismissal if the rule's conditions for dismissal are satisfied; it says the court "may" dismiss if they are. Further process is necessary in this case before dismissal can be considered the responsible course for us to take. The class action device, as a substitute for individual suits or conventional joinder, can achieve economies in multi-

party litigation and allow victims of wrongful acts to obtain legal relief they couldn't otherwise obtain. But class actions are also rife with distorted incentives and conflicts of interest, which makes judicial review of class action settlements, whether at the trial or the appellate level, vital.

This class action suit charged AIG with having cheated other companies that write workers' compensation insurance (the class members) and are required by state statutes to contribute to a workers' compensation insurance liability pool (analogous to an assigned-risk pool for automobile liability insurance). Employers who cannot find an insurer willing to write them a workers' compensation insurance policy because their business involves a high risk of injury to their employees obtain insurance from the pool.

Allocation of the cost of the liability pool among its members is based on the amount of workers' compensation insurance that each member writes willingly. The suit charged that AIG cheated the other members of the pool by underreporting the premiums it received for the workers' compensation insurance that it wrote willingly. Its underreporting is alleged to have caused the class members to pay a portion of what should have been AIG's contribution to the pool. Liberty, one of the class members, became the named plaintiff and sought to become the class representative. Actually it designated two of its subsidiaries to be the named plaintiffs—the two subsidiaries that filed the separate appellate brief that I mentioned.

AIG responded by filing suits against a number of the members of the class, including Liberty, charging that they were cheaters too, because they too had underreported their premiums from the insurance they sold willingly. Liberty responded by filing counterclaims against AIG in AIG's suit against it. The counterclaims accused AIG of having underreported premiums in a number of states not involved in the class action. Liberty is the only member of the class that has individual as well as class claims against AIG.

AIG agreed to pay $450 million to the class to settle both the class claims and Liberty's individual claims. Liberty wanted more. It argued that its counterclaims gave it leverage over AIG that should make AIG agree to a more generous settlement, because a settlement would buy AIG peace in the form of a release of those counterclaims. Liberty wanted to be compensated for selling AIG that peace. But it didn't want *just* a bigger share of $450 million. It argued that AIG's offer to the class was far too low, and not only because of the value Liberty assigned to its counterclaims. It wanted AIG to agree to pay $3.1 billion in settlement of the class action, of which $700 million would go to Liberty instead of a mere $99 million, its share of the $450 million ultimately awarded in the settlement. Of course if AIG could be forced to pay $3.1 billion, all the class members—not just Liberty—would be better off. But AIG was unwilling.

With Liberty holding up settlement by its intransigence, ACE INA Holdings, Inc. and six other class members intervened in the district court, becoming parties. They

were appointed class representatives for a settlement class, accepted AIG's $450 million settlement offer, and asked the district judge to approve the settlement, which he did.

Only one class member objected to certification of the settlement class and ultimately to the settlement itself—Liberty. Its objections, renewed in these appeals that the majority has decided to dismiss blind, were not only that the settlement was too small but also, as I mentioned earlier, that the allocation of the $450 million among class members ignored the fact that some of them had been targets of counterclaims by AIG. Their share of the settlement should have been offset to reflect the value to them of AIG's releasing those counterclaims, while the share received by the class members who had not been targets of AIG's counterclaims should have been correspondingly increased—but were not. Instead the settlement money was divided in proportion to each class member's share of the liabilities that it had incurred as a result of AIG's misconduct, without any offsets. That is the basis of the argument advanced by Liberty's subsidiaries in their separate brief that the judge should have created two subclasses with separate counsel, one for the members who were named in AIG's counterclaims (and thus benefited from the release of those counterclaims, which was part of the settlement) and the other for those class members who weren't. Representation of a class by one plaintiff or one group of plaintiffs is inadequate under Fed. R. Civ. P. 23(a)(4), (g)(4) if there is a potential dispute between factions within the class over allocation of settlement proceeds. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856-59

(1999); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-28 and n. 20 (1997); *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242, 249-53 (2d Cir. 2011).

Liberty's unique individual claim to have been underpaid in the settlement because it was forced to release its counterclaims against AIG too cheaply has been resolved by the settlement with AIG of Liberty's appeal. The money for that settlement—the money AIG is paying to persuade Liberty to drop its appeal—will not come out of the $450 million of class settlement money. Were it the only claim, therefore, summary dismissal of Liberty's appeal under Fed. R. App. P. 42(b) would be proper. But since it's not the only claim, to allow Liberty's subsidiaries to withdraw their objection to the size of the settlement and to the alleged misallocation of settlement proceeds among the remaining class members could deny the class a shot at a larger and more equitably distributed settlement. If, pursuant to Liberty's submission, AIG paid $3.1 billion in settlement, of which $700 million went to Liberty, $2.4 billion would go to the rest of the class rather than the $351 million ($450 million minus $99 million) that it will receive if the settlement approved by the district court stands.

As amended in 2003, Fed. R. Civ. P. 23(e) (in what is now subsection (e)(5)) says that "an objection [to a class action settlement] may be withdrawn only with the court's approval." As the committee note points out, the logic of the rule applies to the withdrawal of an objection on appeal. "Once an objector appeals, control of the

proceeding lies in the court of appeals. The court of appeals may undertake review and approval of a settlement with the objector, perhaps as part of appeal settlement procedures, or may remand to the district court to take advantage of the district court's familiarity with the action and settlement." 2003 Committee Notes to Fed. R. Civ. P. 23(e). My concern is that the opposition of Liberty's subsidiaries to the settlement may have led other members of the class not to appeal the allocation of the settlement proceeds, trusting that someone (namely the Liberty group) was carrying that ball for them. Class counsel, it is true, is not objecting to the dropping of the appeal. But if class counsel could always be trusted to be the loyal and competent representative of the class, there would be no requirement that class action settlements be submitted for approval by a court, with approval dependent on the outcome of a hearing to determine the fairness of the settlement to the class. "We and other courts have often remarked the incentive of class counsel, in complicity with the defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers—the deal that promotes the self-interest of both class counsel and the defendant and is therefore optimal from the standpoint of their private interests." *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011).

For all we know, the amount that AIG has agreed to pay Liberty to drop its appeal is not just an estimate

of the value of Liberty's individual claim beyond its share of the class action settlement, but includes a "bribe" given to Liberty by AIG to take the issue of equitable allocation of settlement proceeds among class members out of contention because the issue if taken up by the appellate court (by us, that is) might be resolved against approving the settlement. I have pointed out that members of the class who are disappointed by the existing allocation may have been counting on Liberty to champion their cause in this court. But class action settlements require judicial review (the "fairness" hearing) even when there are no objectors, in recognition of the conflicts of interest that pervade class action litigation. Fed. R. Civ. P. 23(e), (e)(2); 4 William B. Rubenstein et al., *Newberg on Class Actions* §11:48 (4th ed. 2012) ("despite a lack of opposition, the court should not lose sight of its responsibility to analyze independently and intelligently the settlement"); Federal Judicial Center, *Manual for Complex Litigation* § 21.61 (4th ed. 2004); cf. *Mirfasihi v. Fleet Mortgage Corp.*, 551 F.3d 682, 686-87 (7th Cir. 2008); *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 812-13 (3d Cir. 1995).

So how should we proceed? We could remand the case to the district court for a determination of whether to approve the dismissal of Liberty's appeal. But that would inject needless delay. A superior alternative would be to conduct our own investigation of whether to approve the settlement between Liberty and AIG. The first step would be simply to require submission to us of the settlement agreement. Maybe on reading it we'd

conclude that it is innocuous and dismiss the appeals. But maybe not. According to Liberty its independent (non-class) claim against AIG was valued at $25 million in the district court settlement. If Liberty's appellate settlement with AIG exceeds that amount, this may be a clue that AIG is paying Liberty to drop objections to the settlement that, were they accepted, would benefit the class. In that event the class is being hurt by the blind withdrawal of Liberty's appeal unless no more money can be squeezed out of AIG, which we don't know.

We should not dismiss the appeal without at least informing ourselves of the terms of Liberty's settlement with AIG. In dismissing the appeals without doing so we are acting in haste, and for no good reason. The motion to dismiss the appeals was filed more than two months ago. Rather than arguing over whether to dismiss them we could within this period have completed the investigation that would reveal whether we should grant the motion.